UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:09-CIV-05583 (JFK) (GWG)

CURTIS JAMES JACKSON, III
p/k/a 50 CENT, TOMORROW
TODAY ENTERTAINMENT INC.,
a New York corporation, and
G-UNIT RECORDS, a New York
corporation,

        Plaintiffs,

    v.

LEE Q. ODENAT, a/k/a "Q," d/b/a
WWW.WORLDSTARHIPHOP.COM,
WORLDSTAR HIP HOP, INC., a Nevada
Corporation; WORLDSTAR, LLC, a Delaware
limited liability company; WSHH337, LLC,
a Delaware limited liability company;
JOHN DOE LLC(S)/CORPORATION(S)

        Defendants,

    v.

YVES MONDESIR,

        Third-Party Defendant.
_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii - vii

    Citations to the Record ........................................................................... viii

    I. FACTS. ................................................................................................ 1-11

          a.    50 Cent, G-Unit and www.thisis50.com ................................... 1

          b.    DJ Whoo Kid. .......................................................................... 2

          c.    Defendants' website, the evolution of ...................................... 2

          d.    The Three Images Used on the Masthead of
               www.worldstarhiphop.com ....................................................... 5

                  Generally ...................................................................... 5
                  Image #1 (50 Cent robot) ............................................ 5
                  Image # 2 (All G-Unit) ............................................... 6
                  Third image (various artists) ........................................ 9

          e.    Q's Various Excuses ................................................................ 9
                  1. The Mixtape Excuse ................................................ 9
                  2. Underground world/common struggle ..................... 10
                  3. Other People Were Doing It .................................... 10
                  4.  Use of Other Artists' Images ................................. 10
                  5. Authorization from Whoo Kid ................................ 11

    II.    Federal Copyright Infringement .................................................... 11

    III.    Violation of New York Civil Rights Law Sections 50 and 51 ........... 13

    IV.    Violation of Section 43(a) of the Lanham Act
          Federal Unfair Competition/False Endorsement ........................... 14

    V.    Violation of Section 32 of the Lanham Act
          Infringement of Federal Trademarks ........................................... 19

    VI.    Common Law Unfair Competition .................................................. 21

    VII.    Plaintiffs Are Entitled to Summary Judgment on the Supplemental
          Complaint ................................................................................... 24

    VIII.    Plaintiffs Are Entitled To Summary Judgment As To Defendants'
          Affirmative Defenses .................................................................. 27

# 905016 v1

## TABLE OF AUTHORITIES

<u>**Cases**</u>

*AT & T Corp. v. Microsoft Corp.,*
   No. 01-4872, 2004 WL 188078 (S.D.N.Y. Feb. 2, 2004)......................................34

*Allen v. National Video, Inc.,*
   610 F. Supp. 612 (S.D.N.Y. 1985). ........................................................15, 16, 18

*American Network, Inc. v. Access America/Connect Atlanta, Inc.,*
   975 F. Supp. 494, 497 (S.D.N.Y. 1997)...............................................................28

*Apollo Distributing Co. v. Apollo Imports, Inc.,*
   341 F. Supp. 455, 459 (S.D.N.Y. 1972)...............................................................22

*Arrow Fastener Co., Inc. v. Stanley Works,*
   59 F.3d 384, 390–91 (2d Cir. 1995).....................................................................19

*Audi AG v. Shokan Coachworks, Inc.,*
   592 F. Supp. 2d 246, 270 (N.D.N.Y. 2008). ........................................................34

*Bondar v. LASplash Cosmetics,*
No. 12-1417, 2012 WL 6150859 (S.D.N.Y. Dec. 11, 2012). ................................13, 14, 22

*Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,*
   746 F.Supp. 320, 329 (S.D.N.Y. 1990)................................................................35

*Brother Records, Inc. v. Jardine,*
318 F.3d 900, 903-04 (9th Cir. 2003) ..................................................................32

*Brown v. Kinross Gold U.S.A., Inc.,*
   531 F. Supp. 2d 1234, 1241-1242 (D. Nev. 2008)................................................25

*Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.,*
   No. 10-2333, 2011 WL 1327137 *4 (S.D.N.Y. 2011)...........................................14

*Burck v. Mars. Inc.,*
*571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008)* .........................................................15

*Caesar v. Chemical Bank,*
   66 N.Y.2d 698, 701 (N.Y. 1985) ..........................................................................13

*Cerasani v. Sony Corp.,*
   991 F.Supp. 343, 356 (S.D.N.Y. 1998).................................................................13

*Childers v. High Society Magazine, Inc.*,
   557 F. Supp. 978 (S.D.N.Y. 1983) ....................................................................11

*Citigroup Inc. v. City Holding Co.*,
   97 F. Supp. 2d 549, 568 (S.D.N.Y. 2000) .........................................................29

*Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*,
   933 F.2d 162, 170 (2d Cir. 1991)......................................................................20

*Consolidated Cigar Corp. v. Monte Cristi de Tabacos*,
   58 F. Supp. 2d 188, 200 (S.D.N.Y. 1999). ........................................................20

*Curtis James Jackson v. Grupo Industrial Hotelero, S.A., d/b/a "Coco Bongo,"*
   Case No 07-22046 (S.D. Fla.)............................................................................35

*Curtis James Jackson v. Taco Bell Corp.*,
   Case No. 08-06545(S.D.N.Y.). ..........................................................................35

*Davis v. Blige*,
   505 F.3d 90, 99 (2d Cir. 2007).....................................................................11, 31

*Dive N' Surf, Inc. v. Anselowitz*,
   834 F. Supp. 379, 382 (M.D. Fla. 1993).............................................................12

*Energy Brands Inc. v. Spiritual Brands, Inc.*,
   571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008)........................................................28

*F.D.I.C. v. Giammettei*,
   34 F.3d 51, 54-55 (2d Cir. 1994). .....................................................................27

*Famous Horse Inc. v. 5th Ave. Photo Inc.*,
   624 F.3d 106, 109 (2d Cir. 2010)......................................................................15

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
   499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)...............................11

*Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*,
   807 F.2d 1110, 1113 (2d Cir. 1986)...................................................................12

*Fletcher v. Atex, Inc.*,
   68 F.3d 1451, 1456 (2d Cir. 1995).....................................................................24

*Greenaway v. Corcoran Group*,
   26 Misc. 3d 1207(A), 906 N.Y.S.2d 779 *4 (N.Y. Sup. 2010). ...........................13

*Gruner + Jahr USA Publ'g v. Meredith Corp.,*
    991 F.2d 1072, 1075 (2d Cir. 1993)............................................................19

*Harco Nat'l Ins. Co. v. Green Farms, Inc.,*
    No. Civ.A. 1331, 1989 WL 110537, at \*5 (Del.Ch. Sept. 19, 1989)....................25

*Hanson v. Denckla,*
    357 U.S. 235, 253, 78 S.Ct. 1228 (1958)........................................................30

*Harrison v. NBD Inc.,*
    990 F.Supp. 179, 183 (E.D.N.Y. 1998) .........................................................24

*Hsin Ten Enter. USA, Inc. v. Clark Enters.,*
    138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000)....................................................30

*ICG-Internet Commerce Group, Inc. v. Wolf,*
    519 F. Supp. 2d 1014, 1018 (D. Ariz. 2007). ................................................11

*International Shoe Co. v. Washington,*
    326 U.S. 310, 316, 66 S.Ct. 154 (1945)..........................................................30

*James Burrough Ltd v. Sign of the Beefeater, Inc.,*
    540 F.2d 266, 276 (7th Cir. 1976). ........................................................15, 16

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,*
    58 F.3d 27, 34 (2d Cir. 1995)......................................................................22

*Johnson & Johnson v. Carter-Wallace, Inc.,*
    631 F.2d 186, 189 (2d Cir. 1980)..................................................................18

*Kamar International, Inc. v. Russ Berrie and Co.,*
    657 F.2d 1059, 1062 (9th Cir.1981). ............................................................12

*Kemp v. Bumble Bee Seafoods, Inc.,*
    398 F.3d 1049, 1058 (8th Cir. 2005) ............................................................17

*Lorenz v. Beltio, Ltd.,*
    114 Nev. 795, 963 P.2d 488, 496 (1998)........................................................25

*Lottie Joplin Thomas Trust v. Crown Publishers, Inc.,*
    592 F.2d 651, 655 (2d Cir. 1978)..................................................................31

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574, 587, 106 S.Ct. 1348 (1986)......................................................35

*Mooney v. City of New York,*
    219 F.3d 123, 131 (2d Cir. 2000)..........................................................................34

*Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC,*
    875 F. Supp. 2d 211, 223 (W.D.N.Y. 2012) ...................................................29

*New Kids on the Block v. News America Pub., Inc.,*
    971 F.2d 302, 307-308 (9th Cir. 1992) ............................................................33

*Ostrander v. Accelerated Receivables,*
    No. 07-827, 2009 WL 909646 *4 (W.D.N.Y. Mar. 31, 2009)). ..........................35

*Penguin Group (USA) Inc. v. American Buddha,*
    16 N.Y. 3d 295, 946 N.E. 2d 159 (N.Y. 2011). ................................................28

*Petersen v. Vallenzano,*
    849 F. Supp. 228 (S.D.N.Y. 1994) ..................................................................26

*Playboy Enterprises, Inc. v. Frena,*
    839 F. Supp. 1552, 1556-57 (M.D. Fla. 1993) ................................................12

*Polaroid Corp. v. Polarad Electronics Corp.,*
    287 F.2d 492, 495 (2d Cir. 1961)..............................................................15, 19

*ProFitness Physical Therapy Center v. Pro-Fit Orthopedic
and Sports Physical Therapy, P.C.,*
    314 F.3d 62, 67 (2d Cir. 2002)........................................................................34

*Ryan v. Volpone Stamp Co., Inc.,*
    107 F. Supp. 2d 369, 391 (S.D.N.Y. 2000)......................................................13

*S.C. Johnson & Son, Inc. v. Clorox Co.,*
    241 F.3d 232, 238 (2d Cir. 2001)....................................................................15

*SEC v. Montle,*
    65 Fed. Appx. 749, 753 (2d Cir. 2003).............................................................30

*Shechter v. Comptroller of New York,*
    79 F.3d 265, 270 (2d Cir. 1996).......................................................................27

*Sonnenblick-Goldman Co. v. ITT Corp.,*
    912 F. Supp. 85, 89 (S.D.N.Y. 1996)...............................................................24

*Sony Corp. of America v. Universal City Studios, Inc.,*
    464 U.S. 417, 451, 104 S.Ct. 774, 793 (1984).................................................31

*Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*,
    683 F.2d 704, 708 (2d Cir. 1982)....................................................................15, 19

*Steinberg v. Columbia Pictures Industries, Inc.*,
    663 F. Supp. 706, 716 (S.D.N.Y. 1987)....................................................................31

*Stern's Miracle-Gro Products, Inc. v. Shark Products Line*,
    823 F. Supp. 1077, 1087-87 (S.D.N.Y. 1993. ....................................................22

*Streetwise Maps, Inc. v. VanDam, Inc.*,
    159 F.3d 739, 743 (2d Cir. 1998)....................................................................19

*TCPIP Holding Co., Inc. v. Haar Communications, Inc.*,
    244 F.3d 88, 103-104 (2d Cir. 2001). ....................................................32

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93, 102-103 (2d Cir. 2010). ....................................................32

*Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*,
    559 F. Supp. 1189, 1199 (E.D.N.Y. 1983 ....................................................23

*Versace v. Versace*,
    No. 01-9645, 2003 WL 22023946 (S.D.N.Y. Aug. 27, 2003)....................................20

*Volkswagenwerk Aktiengesellschaft v. Church*,
    411 F.2d 350 (9th Cir. 1969). ....................................................33

*William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*,
    933 F.2d 131, 139 (2d Cir. 1991)....................................................................25

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286, 297, 100 S.Ct. 559, 567 (1980)....................................................30

## Statutes and Other Authorities

15 U.S.C. § 1057(b). ....................................................................20

15 U.S.C. § 1065. ....................................................................20

15 USC § 1114(1)(a)....................................................................19

15 U.S.C. §1115(4) ....................................................................32

15 U.S.C. § 1125(a)(1)(A). ....................................................................14

17 U.S.C. §§ 106(1) and (5)........................................................................................11

17 U.S.C. § 107......................................................................................................31

17 U.S.C. § 410(c)..................................................................................................12

17 U.S.C. § 507(b)..................................................................................................31

28 U.S.C. § 1338(b)................................................................................................27

28 U.S.C. § 1367(a)................................................................................................27

CPLR 302(a)(1)......................................................................................................28

CPLR 302(a)(2)......................................................................................................28

CPLR 302(a)(3)................................................................................................28, 29

Nev.Rev.Stat. § 78.7470(c)......................................................................................25

McKinney's Debtor and Creditor Law § 275............................................................26

McKinney's Debtor and Creditor Law § 273-a..........................................................26

New York Civil Rights Law Sections 50 and 51..................................................13, 28

Rule 12(b)(6), Fed.R.Civ.P......................................................................................27

McCarthy § 23:11 (4th ed.)......................................................................................34

McCarthy § 23:100 (4th ed.)....................................................................................17

McCarthy § 28:15 (4th ed.)......................................................................................14

McCarthy § 31:156.50 (4th ed.)...............................................................................32

### Citations to the Record

Citations to the record refer to court filings by docket number ("DE __"), to documents filed as Exhibits to Plaintiffs' Motion for Partial Summary Judgment as "Ex. __", to paragraphs of Plaintiffs' Statement of Material Facts in Support of Motion for partial Summary Judgment as "F.-__", and to the following declarations and depositions, all filed in support of this Motion, as follows:

| | |
|---|---|
| Deposition of Curtis Jackson p/k/a 50 Cent, (4/20/10) | "CJ-__" |
| Declaration of Curtis Jackson p/k/a 50 Cent | "D/CJ-¶__" |
| Deposition of Lee Q. Odenat (6/11/10) | "Q1" |
| Deposition of Lee Q. Odenat (5/3/11) | "Q2" |
| Deposition of Lee Q. Odenat (6/27//12) | "Q3" |
| Deposition of Lee Q. Odenat (12/6/12) | "Q4" |
| Deposition of Yves Mondesir p/k/a "DJ Whoo Kid",(8/13/10) | "WK" |
| Deposition of Sharon Salamone (4/21/10) | "ShS" |
| Deposition of Donald Coats (6/28/12) | "DC" |
| Deposition of Donald Coats (6/29/12) | "DC" |
| Deposition of Sharon Stewart (7/31/12) | "SS" |
| Deposition of Edward Dwyer (8/1/12) | "ED" |
| Declaration of Aram Sinnreich | "D/AS" |
| Declaration of Susan Hilderley | "D/SH" |
| Declaration of Charles Norton, III | "D/CN" |
| Declaration of Karen Stetson | "D/KS" |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs are entitled to partial summary judgment of liability on all claims, as the undisputed facts show that Defendant Odenat systematically and repeatedly infringed the Plaintiff's highly valuable intellectual property rights to build up his internet business, www.worldstarhiphop.com, capitalizing on Plaintiff's extreme fame and highly successful branding efforts while targeting the same customers who make up Plaintiff's fan base and advertisers Plaintiff seeks for his own competing website, www.this50.com.

### I. FACTS

**a.    50 Cent, G-Unit and www.thisis50.com.**  Plaintiff Curtis James Jackson, III p/k/a 50 Cent is a resident of Connecticut with business offices in New York.  Plaintiff Jackson is the sole officer and director of Plaintiff TOMORROW TODAY ENTERTAINMENT INC. ("TTE"), and Plaintiff G-UNIT RECORDS, both New York corporations, conducting business in New York.  D/CJ-¶¶ 1-3.  Plaintiff is a world-renowned, enormously popular and successful recording artist, rap and hip-hop performer, record producer, actor and entrepreneur.  Jackson's albums released to date have sold more than 25 million copies.  50 Cent has also starred in films, including the 2005 movie Get Rich or Die Tryin' and has earned 13 Grammy nominations.  He is one of the most recognized and admired musical artists in the world.  D/CJ-¶ 5.

50 Cent has a huge fan base largely comprised of the 18-35 year-old age demographic and is particularly well known and popular among fans of hip-hop music.  In addition to being a solo recording artist, record producer and rap and hip-hop performer, 50 Cent is a member of the rap and hip-hop group known as "G-Unit," and the President of Plaintiff G-Unit Records, a well-known and popular record company which produces and markets recordings of hip-hop, and other, music, including by the musical group G-Unit and the individual members thereof.  In

1

2003, 50 Cent created the G-Unit Clothing Company, an urban clothing line marketed and promoted under the trademark G-UNIT.  D/CJ-¶¶ 10-13.

      The G-UNIT mark has become a strong, well and favorably known designation of origin to the general public throughout the United States for the goods and services of 50 Cent with sales exceeding $150 million.  D/CJ-¶ 14.  In addition to these businesses, 50 Cent is also the President and sole owner of Plaintiff TTE, which owns and operates the popular internet website, www.this50.com, devoted to 50 Cent, G-Unit and coverage of the hip-hop industry.  Plaintiffs' website, launched in 2007, makes extensive use of 50 Cent's image and the G-UNIT marks. D/CJ-¶ 22.  Plaintiff has emphasized branding and the growth of his trademarks and endorsement opportunities as part of a long-term business plan and has very successfully parlayed his fame as a musical artist to a significant separate revenue stream endorsing others' products and services, including endorsements for, clothing, sneakers, cars, vitamin water, video games, satellite radio, body fragrances, backpacks, watches, audio headphones, energy shots and others.  D/CJ-¶¶ 14-17.

      50 Cent is highly-compensated when he does choose to endorse a product.  D/CJ-¶ 18. By 2007, when Defendant Odenat was utilizing 50 Cent's image and trademark to build his website business without compensation, 50 Cent had already earned cumulatively in excess of $150,000,000 from endorsement deals and was commanding his strongest deals in the marketplace up to that point in time.  In fact, by 2007, one third to one half of 50 Cent's income was derived through branding ventures as opposed to recorded music, music publishing, live touring, and movies and television combined.  D/CJ-¶ 19.

857583

  **b.**  **DJ Whoo Kid.** DJ Whoo Kid is a deejay and a radio personality. WK-4, 5, 9,
12. A deejay attends concerts, parties or clubs and plays prerecorded music. WK-9.[1] Whoo Kid
works under and owns the company Shadyville which has a stable of 80 dee jays for hire. WK-
49. Whoo Kid has worked with the musical group G-Unit and with many other well-known hip
hop artists. WK-17, 31; Q1-188. Whoo Kid has always been paid as an independent contractor
for any deejay work he has performed for the musical group G-Unit or 50 Cent. WK-70-73;
ShS-58-60. In addition to deejaying for various artists, Whoo Kid has produced and distributed
mixtapes that have included the music of many hip hop artists. WK-17, 95. Mixtapes are
essentially non-commercially released promotional sound recordings, usually of short duration,
intended to spark interest in either an artist or an upcoming commercially released album. WK-
81, 86. From approximately 2002 to 2006, Whoo Kid was involved in a for-profit enterprise of
producing and distributing mixtapes as physical CDs for sale. WK-24-29; 97. In addition to 50
Cent and G-Unit mixtapes, this mixtape business also distributed mixtapes by 40 to 60 other
artists. WK-31. None of the artists who appeared on the mixtapes were paid from the sale of the
mixtapes. WK-29; Q1-189-90. During the time of this mix-tape "business," Whoo Kid utilized
at least 40 distributors, including Odenat, to distribute mixtapes CDs to what he called "mom and
pop" stores. WK-31.

  **c.**  **Defendants' website, the evolution of.** Defendant LEE Q. ODENAT (a/k/a/
"Q") owns, maintains, manages and operates the website www.worldstarhiphop.com which was
launched in July 2005.[2] Q1-39. Prior to that, from 2001 to 2005, Odenat operated a website
which Odenat described as a "mixtape site" known as Phatmixtapes.com. According to Odenat,
Phatmixtapes.com (which was later known as nycphatmixtapes) "was a 100% Whoo Kid site – it

---

[1] " A disc jockey (also known as DJ or deejay) is a person who selects and plays recorded music for an audience."
Urban Dictionary. http://www.urbandictionary.com/define.php?term=dj%20disc%20jockey%20deejay
[2] But see, Section VII, infra, for events occurring after the lawsuit was filed as to ownership of the website.

857583

was all his mixtapes." Q1-186-187; 190.  "All his cd's everyone he worked with, Mob Deep,

Puggy, all the rappers."  Q1-188.  Odenat claims that he focused on Whoo Kid because he was

trying to book shows for Whoo Kid and would receive a percentage of his bookings.

Odenat has testified that when he launched worldstarhiphop.com, in 2005, he wanted a

broader focus, including "other artists and other DJ's."  Q1-190.  From 2005 to the end of 2007,

according to Odenat, the primary content of worldstarhiphop.com was mixtapes.  However, by

early 2008, the focus shifted to videos.  Odenat has characterized the site as:

> It's a hip hop website which is not the same as hip hop artist music.
> All these artists you see here are mixtape artists and I'm a mixtape website.
> It's a website today for videos.  It's not a music site.
> It was never a 50 cent or g-unit website.  It wasn't a fan site.

Q1-62-64.

Worldstarhiphop.com makes money in two ways:  advertisers pay for ads on the website;

and musical artists pay to have videos posted on the site.  Q1-17; 88-89.  Q3-11-12.  The

website's ability to command fees from advertisers depends on its ability to increase

"readership" or "traffic" to the site.  Q1-88.

As discussed more fully below, Odenat utilized various 50 Cent images and/or the G-Unit

trademark from at least sometime in 2006 to March of 2009 (with a possible interruption in

either 2007 or 2008 due to the site having been "hacked").  Per Plaintiff's unrebutted expert, this

time period constituted critical building years for attracting viewers to Odenat's website.

Specifically, based on publicly available information, Odenat's website had over 109 million

page views and experienced its steepest growth from 2006 to March, 2009 (average monthly

growth from 2007 through March, 2009 was 45.5%).  D/AS-¶¶ 31-32.

Odenat readily admits the success of the website:  "The site is in the top 1,000 websites

on the planet so you know traffic is enormous."  Q1-15  Since receiving Plaintiff's cease and

857583

desist letter in March, 2009, Odenat has changed the format of the website and no longer uses a masthead at all to promote itself:

> **Q:      So today do you still use a banner with top artists on your website?**
> **A:      <u>Well, no, because I don't need to</u>... Q1-24**

### d.  The Three Images Used on the Masthead of <u>www.worldstarhiphop.com</u>

**Generally.**  There are three images at issue.  Each utilize the image of 50 Cent, together with the Worldstar Hip Hop name and logo in close proximity thereto.  In fact, those are the two common denominators in all three mastheads.  Each appeared at the top of the first page of the website.  Odenat:  "That was the top header, front page, first image you see."  Q1-59.  This placement has been referred to as the "masthead" or "banner" by the parties.  As to each banner, Odenat claims not to know who actually created the banner, *i.e.*, who put the images and Worldstar's name together, only that he paid unnamed graphic artists to do it.

> [In general] I have no control over the design of the banners – I just tell them what I want and then the creator creates the banner and he chooses the image – I say just pick random top artists.  It's never me saying any specific names  Q2-22.

Odenat has provided no evidence that these banners were created by third parties.  Moreover, <u>his testimony indicates he believes that the source of the images used is of no concern</u>:

> Q:      Okay.  Do you know where these images came from or you're guessing..
> A:      I have no idea.  I don't know where they came from.
> Q:      You have no idea, okay.  So since you have been sued in this case, have you made any effort to find out where these specific images came from?
> A       No, I don't know where they came from.

Q1-81-82.  Odenat admits that his uses of 50 Cent's images and the G-Unit mark were in connection with advertising his website.  DE 1, ¶ 1; DE 7, ¶ 1.

**<u>Image #1 (50 Cent Robot).</u>**  Image #1 depicts a side view of 50 Cent prominently displayed in the foreground just above the Worldstar Hip Hop name.  Several side view robotic images appear opposite 50 Cent's image.  Behind 50 Cent, although difficult to distinguish, are

images of hip hop artists Jay Z and Jim Jones. Odenat testified that while he does not know the exact dates that this banner was posted on the site, he believes that it was from at least January, 2008 until March of 2009 when he received Plaintiff's cease and desist letter. Q1-22.[3]

As to this image, Odenat testified that he told an unnamed company: "I want a futuristic banner" "of the hottest rappers." Q1-25. Odenat told the graphic artist: "to create a banner which – with the hottest artists at that time put in a banner to – that's it and that's his liking. He chose 50 Cent, Jay Z and Jim Jones." Q1-47. Odenat does not know the name of the company, but believes he paid $1,000 for someone to put it together. Q1-26.

Odenat claims he did not approve the banner in advance, and that an unnamed guy who no longer works for him "put it up" on the site and Odenat liked it. Q1-48-49. Odenat's use of this image coincided with when the site became "full video" and had dispensed with paid membership to download mixtapes. Q1-79-80, 196-197. The actual source of the prominently displayed 50 Cent image is unknown but is believed to be part of the photo shoot for the Jackson album "Curtis" and is available for public viewing on the internet. D/CJ-¶ 25.

**Image # 2 (All G-Unit).** This image is in fact a montage of individual images of G-Unit members and DJ Whoo Kid that have been "cut and pasted" together to form what appears to be a group photo of the musical group G-Unit together with DJ Whoo Kid. D/CJ-¶ 26. The group composite photo is positioned directly above World Star's name. Starting with the image in the upper left-hand side and moving clockwise, the image is of 50 Cent, Young Buck, Tony Yayo, Whoo Kid, and Lloyd Banks. The source of the 50 Cent and Young Buck images is the cover of

---

[3] Odenat has testified that he used only 3 different mastheads from inception of the site to March, 2009, when he received Plaintiff's cease and desist letter. Q1-56, 75. Plaintiff's ability to determine the precise dates of use of each masthead at issue has been blocked by the removal of www.worldstarhiphop.com from the archival site "Wayback Machine" (see D/AS-¶¶ 12-18). Defendant claims he has no access to prior mastheads because his website had no back-up files, he had changed servers, and his site had been "hacked," leaving only the archival site "Wayback Machine" as a source for this information. Q1-199-200; ED-129, 149.

a hip hop magazine known as XXL (special year end 2006 edition).  D/CJ-¶ 26.  G-Unit Records

is a registered copyright co-owner of the remaining two images:  the image of Tony Yayo is

from the photo shoot for the album "Thoughts of a Predicate Felon" and the image of Lloyd

Banks is from the photo shoot for the album "Beg for Mercy."  D/SH-¶¶ 2-3.

Odenat has testified he believes this masthead was utilized on the website for "between

six months and a year." Q1-75.  Odenat says that he "probably paid some kid $40 or $50 to put

together this masthead and did not "know where he got these images from."  "I don't know the

company. I don't do it. I don't know. I'm not a graph[ic] designer." Q1-71-73; 83. Odenat

testified that at the time of Masthead #2, his sole purpose was to promote Whoo Kid:

> At that time, you know, I was, you know, I had my site, but it was just promoting
> Whoo Kid.  The images all promoting Whoo Kid.  Whoo Kid is on every image.
> Q1-70.

For that reason, Odenat claims he instructed the graphic designer:

> I said use Whoo Kid image because I work for him, so he decided to put Whoo
> Kid and his, you know his family because G-Unit is Whoo Kid's family. Q1-73.
> Q: So even though this person did not carry out your instructions of using Whoo
> Kid's image and used others' images as well, you nevertheless put it up and kept
> it up, correct?
> A:     Yes.

Q1-75.

Although Odenat has repeatedly testified that he does not know where the images for the

various banners came from (Q1-164-165), including when specifically asked that question with

regard to Masthead #2, he also testified regarding Masthead #2:  "I never know where they come

from, but they're all from like, I think mixtapes... probably from a mixtape." Q1-71.

Odenat has never produced any evidence that any of the images used in any of the

banners, including the composite group image on Masthead #2 was ever on the cover or

packaging from any mixtape and has, rather, been vague and equivocal when asked:

857583

> Q:     Okay, these images, were they actually images of the mixtape?  In other
>        words, they were like the packaging of the mixtape?
>
> A:     The packaging and any type of picture off the internet or magazine that
>        was available for everyone to use on the internet basically.

Q1-167-68.

The closest Odenat has come to unequivocally stating that <u>any image</u> on <u>any banner</u> "came from" a mixtape is the claim that <u>the individual image</u> of Lloyd Banks only (not the group image) "looks like it came from a Whoo Kid mixtape" called "No Peace Talks" but "photo shopped" in reverse order.  Q1- 65, 72-73.

In addition to 50 Cent's image and the two copyrighted images of Yayo and Banks, Masthead #2 also utilized "G-UNIT," a registered trademark of Plaintiff.  D/CJ-¶ 13. Specifically, to the right of the group photo at the very top of the home page, there are various tabs to access other sections of the website.  The tab prominently located directly in the middle of the top bar is labeled "G Unit Radio" next to a tab labeled "Members."  G Unit Radio was a mixtape series created or "hosted" by Whoo Kid that included music by G-Unit and others.  Q1- 105, 190; D/CJ-¶ 29.  According to Odenat, when a visitor to the site clicked on the G Unit Radio tab, they could "hear it, sample, listen, download it."  Q1-191.

As discussed more fully below, this banner, including the images of the musical group G-Unit, the top-centered direct route tab to G-Unit Radio and the sole G-Unit content on the rest of the page, gives the viewer the overall impression that Worldstar is an official G-Unit website. *See also* D/AS-¶¶ 24-28.

When asked about the impression the banner conveys, Odenat testified:

> If Whoo Kid wasn't there, I would agree with you [that it looks like it's a G-Unit
> Website], but Whoo Kid is there and Whoo Kid is affiliated with mixtapes and
> it's clear in writing.  It's a Whoo Kid mixtape G-Unit site.

Q1-191-192.  Apparently, Odenat believes that the saving grace as to why the site at this time did not look like an official G-Unit website is because, in addition to the images of the musical group G-Unit, Whoo Kid's image is also included; however, it is difficult to square this testimony with Odenat's additional testimony that he believes Whoo Kid is in fact a member of G-Unit.  Q1-192.  If Odenat believed that Whoo Kid was actually a member of G-Unit, even wrongly, then he has conceded that the intent of the site at this time was to convey the impression that it was an official G-Unit site.

**Third image (Various Artists).**  In this image, 50 Cent is depicted along with various other well known hip hop artists and with Whoo Kid front and center.  In order, from left to right, are images of the following people:  Lil Wayne, Jim Jones, Chamillionare, Whoo Kid, 50 Cent, Jay Z and Young Jeezy.  Q1-201.  Like the others, Odenat testified that "this is another header which was part of the site that was designed [by] someone" unidentified.  Q1-201  Although Odenat could not state the precise time period this image was used, he thought it was used for a 6-12 month period ending in April of 2007.  Q1-201-202.

It is undisputed that Odenat did not seek permission from 50 Cent or any of the other members of the musical group G-Unit to utilize any of their images as part of Worldstarhiphop.com's masthead.  Q1-164, 171, 202; Q2-54, 69; D/CJ-¶ 28.

**e.  Q's Various Excuses**

Odenat has provided various and contradictory  explanations as to why he thought it was permissible to use 50 Cent's image:

**1.  The Mixtape Excuse.**  First, Odenat claims that 50 Cent's "image was available for the world to copy because he came from mixtapes."  Q1- 27, 28.  Why that would be true is certainly not apparent and Odenat was questioned further:

Q:      Is it your testimony, your belief, that every one of these images came from a mixtape and so it was okay to use?

A:      I believe that these images were on mixtapes because, you know, they were available on the internet.  Yes.

Q:      Do you think that all images that appear on mixtapes are – they're lawful to use for your own purposes?

A:      The images were maybe available online, which is people will put on their websites as well as probably off magazine covers, I'm not sure, maybe articles

Q:      So when you say available online, that you could find them online to be able to look at them correct?

A:      I see them everywhere.

Q:      Right, okay.  So they're available online and then does that mean – do you believe, then, that if they're available online, that you're allowed to use them for your own commercial purposes?

A:      Well the images I seen online – well, I don't – I haven't made these banners, so I don't know what he was thinking.

Q1-80-83.

**2. Underground world/common struggle**.  Odenat next claimed that since he and 50 Cent both had common struggles obtaining success and both came from the same neighborhood, that 50 Cent should not have sued him even if he had the right to, that they are part of the same "underground world" where people don't sue one another for using intellectual property without permission.  Q1-115-116.  **3. Other People Were Doing It**.  Odenat next claimed that other sites were doing the same thing and therefore there was nothing wrong with it: "At the time most sites were doing it so, you know, it's like something we do in hop hop community."  Q2-23.  Aside from the legal insufficiency of this excuse, Odenat has never produced any evidence that there were other websites during the period of infringement(s) who were utilizing either 50 Cent's image or G-Unit's image or trademark as part of the website's masthead to advertise itself and boost viewership.  **4. Use of Other Artists' Images**.  Odenat next claimed that the unauthorized use of 50 Cent's image was somehow ameliorated by the fact that he had used other celebrity images as well (also without authorization):

10

It's other artists on this banner, so it's not like misleading like hey, it's a 50 Cent banner. He's not alone on this banner." Q1-26

**5. Authorization from Whoo Kid**.   According to Odenat, Whoo Kid told Odenat that "50 doesn't care," while at the same time claiming:

> Q:    Did Whoo Kid ever say you could use 50's image in the masthead of your website?
> A:    He never said specific names. He just said you could use me and G-Unit.

Q1-29, 171.

   II. **Federal Copyright Infringement.**  Count V seeks redress for the unauthorized use of two copyrighted photographs in Masthead #2, one of G-Unit member Tony Yayo and one of G-Unit member Lloyd Banks  As attested to by Susan Hilderley of Interscope Records, these photographs were taken in connection with two albums produced jointly by G-Unit Records and Interscope Records, a division of UMG Recordings, Inc. ("Universal").  D/SH-¶¶ 2-3.  They were ultimately used for either the album packaging or for publicity/press purposes.  *Id.* Attached to Ms. Hilderley's declaration are the Copyright Registration Certificates by which the photographs at issue were registered with the U.S. Copyright Office.[4] D/SH-¶¶ 2-3.

   Copyright infringement is established by proving "ownership of a valid copyright" and "copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991)**.** *See also Childers v. High Society Magazine, Inc.*, 557 F. Supp. 978 (S.D.N.Y. 1983).

   Defendant's use of Plaintiff's copyrighted photographs infringed Plaintiff's exclusive rights of reproduction and display.  17 U.S.C. §§ 106(1) and (5).  *See, e.g., ICG-Internet Commerce Group, Inc. v. Wolf,* 519 F. Supp. 2d 1014, 1018 (D. Ariz. 2007) (summary judgment of liability; posting copyrighted video on website violated exclusive rights of copyright holder to

---

[4] Joint owners of copyright may sue for copyright infringement independently of co-owner; therefore, Universal need not be joined in this action as an additional party plaintiff. *See, e.g., Davis v. Blige,* 505 F.3d 90, 99 (2d Cir. 2007).

857583

reproduce and display); *Playboy Enterprises, Inc. v. Frena*, 839 F. Supp. 1552, 1556-57 (M.D. Fla. 1993) (partial summary judgment of liability; posting copyrighted photographs on computer billboard violated exclusive display rights).

In the instant case, Defendant unquestionably copied and displayed Plaintiff's photographs. Defendant admits he never made any effort to determine the source of the photographs (either before or after the lawsuit was filed), much less determine if they were legally protected, or to obtain permission from their owner.[5] Defendant appears to believe that so long as he did not personally copy Plaintiff's photographs, *i.e.*, that someone else did it on his behalf, he is somehow not guilty. However, the copyright claimant need not prove *who* used the copyrighted work to create the copy exploited by Defendant. That Defendant did not himself create the copy is no defense. *Playboy Enterprises, supra*, 839 F. Supp. at 1556. Moreover, under the Copyright Act, **intent or knowledge is not an element of infringement, and thus even an innocent infringer is liable for infringement.** *Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc.*, 807 F.2d 1110, 1113 (2d Cir. 1986); *Playboy Enterprises, supra*, 839 F. Supp. at 1559.

As to ownership of the copyrights, copyright registrations are *prima facie* evidence of the validity of the copyrights. 17 U.S.C. § 410(c); *Dive N' Surf, Inc. v. Anselowitz*, 834 F. Supp. 379, 382 (M.D. Fla. 1993). As to copying, the accused images are not merely "strikingly similar" to Plaintiff's photographs -- but are virtually exact copies, albeit cropped to insinuate a "group shot." Thus, there is no dispute whatsoever that the accused images are "copies" of Plaintiff's photographs, and were not developed independently by Defendant. *Kamar International, Inc. v. Russ Berrie and Co.*, 657 F.2d 1059, 1062 (9th Cir.1981).

---

[5] Odenat admits that at the time of the infringements, he had no procedures or policies in place to ensure that material used on his website did not violate the copyrights or trademarks of others – only a "disclaimer" whereby he would remove content if someone complained. Q1-111-114.

III. **Violation of New York Civil Rights Law Sections 50 and 51.**  This claim is for the unauthorized use of 50 Cent's image by Defendant in violation of New York Civil Rights Law Sections 50 and 51.  Together, these sections create a private right of action for the use of a living person's picture for advertising or trade purposes without that person's written consent, sometimes referred to in other jurisdictions as a "right of publicity." As stated in *Ryan v. Volpone Stamp Co., Inc.*, 107 F. Supp. 2d 369, 391 (S.D.N.Y. 2000):

> By its terms the statute **applies to any use of a person's picture or portrait for advertising or trade purposes whenever the defendant has not obtained the person's written consent to do so**. It would therefore apply, and recently has been held to apply, in cases where the plaintiff generally seeks publicity, or uses his name, portrait or picture, for commercial purposes but has not given written consent for a particular use. . . Thus, the reason New York does not recognize a separate right of publicity is not because it has deemed such interest unworthy of legal protection, but rather because the right of publicity is already subsumed in the statutory right of privacy.

The elements of such action are: "(i) usage of plaintiff's ... picture ... (ii) within the State of New York, (iii) for purposes of advertising or trade, (iv) without plaintiff's written consent." *Bondar v. LASplash Cosmetics*, No. 12-1417, 2012 WL 6150859 *6 (S.D.N.Y. Dec. 11, 2012); *Cerasani v. Sony Corp.,* 991 F. Supp. 343, 356 (S.D.N.Y. 1998).  As is plain from the statute, neither oral nor implied consent is a defense to liability, written consent is explicitly required. *See e.g., Caesar v. Chemical Bank*, 66 N.Y.2d 698, 701 (N.Y. 1985) (granting plaintiff's motion for partial summary judgment as "written consent is explicitly required by the statute."). *See also, Greenaway v. Corcoran Group*, 26 Misc. 3d 1207(A), 906 N.Y.S.2d 779 *4 (N.Y. Sup. 2010) (failure to obtain written consent dispositive).

Plaintiff easily satisfies the elements necessary for this cause of action.  There is no dispute that Defendant repeatedly utilized Jackson's image for advertising or trade purposes within the State of New York specifically to promote and build up the viewers on his website to

attract adverters, the very essence of Odenat's (and Plaintiff's competing website's) business model. Defendant's website undisputedly solicits business in New York and is displayed and viewed in New York. Plaintiff has clearly demonstrated the commercial value of his persona in the marketplace precisely for the type of purpose it was used by Defendant, namely to convey the impression of some sort of sponsorship, association, affiliation or endorsement by Jackson of the website, something for which Jackson is normally paid large sums of money. Moreover, it is undisputed that the use of the Plaintiff's image by Defendant was without the written consent of Plaintiff. Q1-164.

## IV. Violation of Section 43(a) of the Lanham Act Federal Unfair Competition/False Endorsement.

This claim is for the unauthorized use of 50 Cent's image and the words "G-Unit" as a symbol under Section 43(a) of the Lanham Act. See 15 U.S.C. § 1125(a)(1)(A).[6] What is at issue in a Section (43) claim is not a trademark in any particular image, but rather 50 Cent's persona itself. *See, e.g., Bruce Lee Enterprises, LLC v. A.V.E.L.A., Inc.,* No. 10-2333, 2011 WL 1327137 *4 (S.D.N.Y. 2011) ("the mark at issue is Lee's persona."). *See also, e.g., Bondar v. LASplash Cosmetics,* No. 12-1417, 2012 WL 6150859 *5 (S.D.N.Y. Dec. 11, 2012) ("celebrities have a trademark-like interest in their name, likeness, and persona that may be vindicated through a false endorsement claim under the Lanham Act."). McCarthy, § 28:15 (4th ed.) (the mark is the celebrity's persona). The law recognizes that a celebrity has a commercial investment in the "drawing power" of his or her name and face in endorsing products and in marketing a career. The celebrity's investment depends upon the good will of the public, and

---

[6] (1) Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

infringement of the celebrity's rights also implicates the public's interest in being free from deception when it relies on a public figure's endorsement in an advertisement. *Allen v. National Video, Inc.*, 610 F. Supp. 612, 625-26 (S.D.N.Y. 1985).

The elements of a claim for false endorsement are: "that the defendant, (1) in commerce, (2) made a false or misleading representation of fact (3) in connection with goods or services (4) that is likely to cause consumer confusion as to origin, sponsorship, or approval of the goods or services." *Burck v. Mars. Inc.,* 571 F. Supp. 2d 446, 455 (S.D.N.Y. 2008).

The first two elements of the Lanham Act are easily met. The masthead banner is clearly intended to advertise or promote the business of Worldstarhiphop.com as evidenced not only by its placement at the top of the front page of the website, but also by the fact that on each of the images itself, the Worldstarhiphop name and artwork is prominently placed either touching or in close proximity to Plaintiff's image and, on image #2, the G-Unit name. *See, e.g., S.C. Johnson & Son, Inc. v. Clorox Co.,* 241 F.3d 232, 238 (2d Cir. 2001) ("In considering a false-advertising claim, [f]undamental to any task of interpretation is the principle that text must yield to context."). The masthead is the <u>sole identifier</u> of the website itself, telling the customer with whom it is doing business. Second, Defendant's website undisputedly solicits business nationally and the website is displayed and viewed nationally. Therefore, the "interstate commerce" requirement is met.

As for likelihood of confusion,[7] in a celebrity endorsement case, the first factor – the strength of plaintiff's marks and name – concerns "the extent to which plaintiff has developed a favorable association for his mark in the public's mind." *Allen,* 610 F. Supp. at 627, *citing*

---

[7] To determine a likelihood of confusion, courts employ a six factor test derived from *Standard & Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir. 1982) (refining factors stated in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961)). "Confusion" means a belief that the mark's owner sponsored or otherwise approved use of his mark, a consumer need not believe the mark's owner actually produced and marketed the item. *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 109 (2d Cir. 2010).

15

*James Burrough Ltd v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir. 1976).  In this case, it is undisputed that Plaintiff's image and G-Unit are extremely well known to the public, that he has expended considerable investment and effort in building up his image and that of G-Unit and that, as a result of their extreme fame and valuable association, both have been the subject of numerous celebrity endorsement deals.  Defendant does not dispute that both Jackson and G-Unit are extremely well known, particularly among hip hop fans.  Q1-85-87, 150-151.

As to the second factor, this is not a case where the Court must evaluate whether the similarity between the original and that used by Defendant is similar since the Defendant has used the precise, identical image and name.  It is not a case of a 50 Cent "look alike" or a deviation or variation on the name G-Unit and there is no dispute by Defendant that it was in fact 50 Cent's exact image and G-Unit name that were used on the website.

Under the third factor, proximity of the products, again, there is no need for any evaluation here inasmuch as Plaintiff and Defendant are in direct competition with one another. Their websites seek the same viewers, the same advertising dollars, utilizing hip hop related content.  Although there is no requirement that Plaintiff and Defendant actually be in competition to satisfy this element, when they are, it cannot be disputed that there is proximity of products.  *Cf. Allen* at 628*; James Burroughs*, 540 F.2d at 275

The fourth factor, actual confusion, while not required to establish likelihood of confusion, is highly probative of likelihood of confusion.  In this case, Plaintiff has submitted evidence that numerous potential advertisers and others inquired or believed that there was either an affiliation between the two websites, common ownership, or that they were one and the same. Plaintiff and other G-Unit employees became aware of this confusion in the course of operating Plaintiff's website, and the outside agency handling ad placements for thisis50.com has received

16

a number e-mails exhibiting actual confusion between Plaintiff's website and

worldstarhiphop.com.  D/CJ-¶24; D/CN; CJ-71, 77, 192; ShS-37.  Plaintiff's unrefuted expert

has opined that a disproportionate association continues between Plaintiff and G-Unit and

Defendant's website, due to the Defendant's sustained use of 50 Cent and G-Unit's images on

worldstarhiphop.com during its building years and its continued use of domain names *utilizing*

*Plaintiff's brands*, "thisis50" and "G-Unit," which also evidence confusion in the marketplace.

D/AS-¶¶ 4-11, 19-23.  Further, an e-mail to worldstarhiphop.com obtained **from Defendant's**

**own files** shows that advertisers are still confused about a possible "affiliation" between the two

sites as late as September 14, 2011:

> Is there any package you can give an artist with featured video and advertising on
> the homepage?  **Also, does that include being on your other affiliate sites like**
> **thisis50.com?**        D/KS-¶ 3.

The confusion of sophisticated viewers such as advertisers, who are paying customers of the

websites, is particularly compelling, and supports that less sophisticated viewers will also be

confused.  *See e.g.,* McCarthy § 23:100 (4th ed.) ("If a professional, such as a . . commercial

buyer is confused, it is proof of the likely confusion of consumers, who are less likely to detect

differences in marks."); *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1058 (8th Cir.

2005) (same).

    The fifth factor, the sophistication of the relevant consuming public, is also undisputedly

in Plaintiff's favor.  Here, there are two levels of "consuming public," the average viewer of the

website, known to be typically in the 18-35 year age range, who are likely not sophisticated

consumers, and advertisers, who are likely a bit more sophisticated as consumers.  However, in

this case, in light of the virtual identity between the "persona" and the image used, namely, an

exact photograph of the celebrity and the exact G-Unit name, there is no degree of sophistication

that could ameliorate or eliminate the likelihood of confusion.  As the *Allen* court stated (despite involving only a look-alike as opposed to the actual celebrity and his mark, as here):  "[A]t a cursory glance, many consumers, even sophisticated ones, are likely to be confused."

The sixth and final factor is the good or bad faith of Defendant.  Defendant has admitted that he wanted to use the hottest hip hop stars of the time.  Q1-25, 47.  He also admits that he was and is well aware of 50 Cent's fame and G-Unit's popularity.  Q1-85, 87, 150-151. Defendant further admits that he did not receive permission from 50 Cent to use either his image or the G-Unit name at any time prior to utilizing his images and the G-Unit name on the website. Q1-164, 171, 202; Q2-54,69; D/CJ-¶28.  And while intent to deceive is not a necessary element to this cause of action, *see e.g., Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980), Defendant's intent to imply an endorsement or association or affiliation to commercially benefit from the good will associated with 50 Cent and G-Unit could not be clearer.  Most tellingly in this regard, was Odenat's response to the question of whether he still used celebrity images to promote his website.  His response was, "No, I don't need to anymore." The unstated portion of that response is: "now that my website's worth is in the stratosphere."

Each of the *Standard & Poors* factors weigh in Plaintiff's favor and lead to the inexorable conclusion that Defendant's use of Plaintiff's image and the G-Unit name creates a likelihood of consumer confusion that Plaintiff has endorsed or sponsored Defendant's website or is otherwise somehow associated or affiliated with it when, in fact, not only is that false, he is in fact in direct competition with Defendant's website.  As the Court in *Allen* noted:  "When a public figure of Woody Allen's stature appears in an advertisement, *his mere presence is inescapably to be interpreted as an endorsement.*"  610 F. Supp. at 627, n.8.

**V. <u>Violation of Section 32 of the Lanham Act Infringement of Federal Trademarks</u>.** This claim relates to the unauthorized use of the G-UNIT registered trademark that is owned by Plaintiff and which was used by Defendant as part of Masthead #2 in violation of 15 USC § 1114(1)(a). Specifically, Defendant's prominent placement of the G-UNIT trademark as a "link" at the top of and centered in the masthead is likely to cause confusion among consumers as to the source of the goods and services being offered. The confusing/misleading impression conveyed by the manner in which the G-Unit registered trademark was used is that the goods and/or services being offered by the website as a whole were being offered by Plaintiff and not by Defendant.

To prevail on a claim of trademark infringement, a plaintiff must show that the defendant (1) without permission, copied, reproduced, or imitated the plaintiff's (2) registered trademark in commerce (3) as part of the sale or distribution of goods or services (4) and that such use is likely to cause confusion between the two marks. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743 (2d Cir. 1998); *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1075 (2d Cir. 1993). It is undisputed in the instant case that Defendant never sought Plaintiff's permission to utilize the G-UNIT mark, that the mark was used in commerce as part of the sale or distribution of goods or services, and that G-UNIT is a registered trademark entitled to protection. (See Certificates of Registration, D/CJ, Composite Ex. 1). *See Arrow Fastener Co., Inc. v. Stanley Works,* 59 F.3d 384, 390–91 (2d Cir. 1995) (defendant did not dispute validity of plaintiff's mark, only question was whether defendant's use of similar mark was likely to cause confusion).

As stated above, likelihood of confusion is determined by considering the pertinent *Polaroid/ Standard & Poor's* factors. As the Second Circuit has made clear, "when engaging in

857583

this inquiry, registered marks are 'entitled to a liberal application of the law' and, unlike unregistered [marks], disposition by summary judgment is often appropriate where the protection of a registered trademark is at issue." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 170 (2d Cir. 1991). *See also Versace v. Versace*, No. 01-9645, 2003 WL 22023946 *7, *13 (S.D.N.Y. Aug. 27, 2003) (summary judgment, applying *Polaroid*, concluding "as a matter of law a strong likelihood of confusion"); *Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F. Supp. 2d 188, 200 (S.D.N.Y. 1999) (summary judgment on likelihood of confusion and liability).

With regard to the first factor, Plaintiff has put forth undisputed evidence of the strength of the G-UNIT trademark. D/CJ-¶ 14-17. First, the registration itself is *prima facie* evidence of both the validity and the strength of the mark. 15 U.S.C. § 1057(b). Second, because Plaintiff's trademark has been registered for longer than 5 years, it has achieved incontestable status, meaning its strength cannot now be challenged. 15 U.S.C. § 1065. Moreover, Plaintiff has provided proof that it has enjoyed in excess of $150 million dollars in sales utilizing the G-UNIT trademark, that he has extensively promoted it and advertised the mark, and that it is often sought after by commercial advertisers. It is, in short without dispute, a very strong trademark.

With regard to the second factor, similarity of marks, Defendant has utilized Plaintiff's mark exactly, not a variant thereof. This factor, therefore, strongly militates in Plaintiff's favor.

With regard to the third factor, the proximity of Plaintiff's and Defendant's products, as set forth in the previous section, again there is virtual identity and the parties are direct competitors. This factor, therefore, also strongly weighs in Plaintiff's favor.

With regard to the fourth factor, evidence of actual confusion, Plaintiff reiterates the confusion evidence set forth in the previous section, namely, confused potential advertisers and

others, evidence of a continuing disproportionate association between 50 Cent and G-Unit and Defendant's website and as further evidenced by the e-mail contained in *Defendant's own files* showing confusion by a prospective advertiser "with your other affiliate sites like thisis50.com." D/KS-¶ 3.

With regard to the fifth factor, the sophistication of the relevant consuming public, Plaintiff incorporates by reference its prior arguments in this regard, namely, in light of the exact same trademark being used and the context in which it has been used, there is no degree of sophistication that could eliminate the likelihood of confusion. Moreover, the fact that professionals, *i.e.*, advertisers, have been confused shows that it is highly likely that the average consumer – 18-35 year old hip hop fans – would surely be confused as they would exercise a lesser degree of care than an advertiser. Q1-150-152.

Finally, with respect to the good or bad faith of Defendant, Defendant has argued that he was only advertising mixtapes known as G-Unit Radio. Aside from the fact that Odenat was never authorized to sell any 50 Cent or G-Unit mixtapes that contained 50 Cent and G-Unit music, CJ-110-113, the placement and context of "G-Unit Radio" is entirely different from other mixtape sites as attested to by Plaintiff's unrefuted expert including the one example testified to by Odenat himself. According to Odenat, the site Mix Unit also had a "G-Unit Radio" link. Q1-194-195. A comparison of that site and what Defendant did in this case proves Plaintiffs' point. D/AS-¶ 27.

**VI. Common Law Unfair Competition.** This is a claim by 50 Cent and TTE for the unauthorized use of Plaintiff's copyrighted images, his persona, the G-Unit trade name and mark and his trade name "Thisis50" all of which have been unfairly utilized by Defendant to attract

business to his website.  As set forth by this Court in *Bondar v. LASplash Cosmetics*, No. 12-1417, 2012 WL 6150859 *5 (S.D.N.Y. Dec. 11, 2012):

> The elements of an unfair competition claim under New York law are identical to the elements of an unfair competition claim under the Lanham Act (which in turn mirror the elements of a false endorsement claim), with two exceptions. *First,* the plaintiff must show *either* actual confusion *or* a likelihood of confusion .... *Second,* the plaintiff must demonstrate "'some showing of bad faith' on the part of the defendants."  The inquiry into willfulness or bad faith considers whether the defendant adopted its mark with the intention of capitalizing on the plaintiff's reputation and goodwill and on any confusion between [its] and the senior user's product.

*Accord Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir. 1995).

As to the first element, Plaintiff incorporates by reference its prior discussions concerning actual confusion and likelihood of confusion relating to 50 Cent's image and the G-Unit trademark and trade name and, in addition, would state that the likelihood of confusion is further compounded by the Defendant's unauthorized use of the copyrighted images of the two G-Unit members and by the use of the domain names "www.**thisis50**.comwww.worldstarhiphop.com" and "ww**g-unit**w.worldstarhiphop.com" which blatantly incorporate Plaintiff's tradename and trademarks, in order to draw more customers to his own website.  D/AS¶¶ 4-11.

As to the second element, it has been repeatedly stated that the defendant's use of a well-known and hence commercially valuable intellectual property – whether it be an image, a trademark or other symbol – alone warrants a finding of defendant's deliberate purpose to capitalize on the good will Plaintiff has built up over the years.  *See, e.g., Apollo Distributing Co. v. Apollo Imports, Inc.*, 341 F. Supp. 455, 459 (S.D.N.Y. 1972) (granting summary judgment). *See also Stern's Miracle-Gro Products, Inc. v. Shark Products Line*, 823 F. Supp. 1077, 1087-87 (S.D.N.Y. 1993) (adoption of identical well-known mark gives rise to inference of intent to capitalize on the good will and reputation of the mark, as well as any confusion that might

22

result).  As the Court in *Toys R Us, Inc. v. Canarsie Kiddie Shop, Inc.*, 559 F. Supp. 1189, 1199

(E.D.N.Y. 1983) stated it:

> Where… there is little to distinguish the marks themselves and the prior mark is a
> long established one of which the newcomer was aware, doubts about intent are
> resolved against the newcomer, and a reasonable explanation of its choice is
> essential to establish lack of intent to deceive.

In this case, Defendant's explanation of his "choice" is ever-changing, contradictory and

should therefore be discounted entirely.  The myriad of shifting excuses is too numerous to set

forth here (see Section I(e) above), but, in short, Odenat's first explanation was that he simply

wanted to "use the biggest hip hop artists" around, then that he was only trying to promote Whoo

Kid and nothing more, then that he simply wanted to use a "futuristic" banner and never

specified any particular artists who should be in the masthead banner and then, finally, indicated

he was actually promoting mixtapes (even though he admits that when the robotic image was on

his site, it was no longer even a mixtape site).  Odenat cannot deny that he at all times was well

aware not only of who 50 Cent and G-Unit are, but that they are some of the "biggest hip hop

artists" who enjoy tremendous popularity among the hip hop crowd, the exact audience Odenat

was clearly trying to cultivate with his website, worldstar**hiphop**.com.  Had Defendant believed

at any time that he had the right to use Plaintiff's intellectual property on his website, he would

have said so in response to Plaintiff's cease and desist letter.  Instead, Odenat did not respond

(though he did remove the offending images and trademark), then once suit was filed, he began

making these various and sundry contradictory and nonsensical excuses.

Taken together, Defendant's actions and testimony show a clear intent to capitalize on the

tremendous good will and value of Plaintiff, satisfying the second element necessary for this

cause of action.  Moreover, the registration and use of domain names which incorporate the trade

name of Plaintiff's website and the G-Unit trade name and trademark alone is evidence of Defendant's intent to capitalize on Plaintiff's good will.

## VII. Plaintiffs Are Entitled to Summary Judgment on the Supplemental Complaint.

Having intentionally infringed Plaintiffs' intellectual property rights to unfairly compete with Plaintiff, Odenat found himself as a Defendant in this action, the sole owner and operator of www.worldstarhiphop.com, faced with claims for both injunctive relief as to his website and exemplary and punitive damages for his wrongful conduct.  Odenat responded by forming, well after this case was instituted, separate alter ego entities, including WORLDSTAR HIP HOP, INC., a Nevada corporation and WORLDSTAR, LLC, a Delaware limited liability company, and used them to effectuate the fraudulent, not for value, transfer of assets, specifically including his website and the proceeds thereof.  The Supplemental Complaint seeks as relief that Odenat's alter ego entities be held responsible for any judgment herein, including injunctive relief concerning the website, and that, in addition to any remaining assets held in Odenat's name, in determining Odenat's assets for purposes of any exemplary or punitive damages, all of the assets of Defendant's alter ego entities, including the fraudulently transferred website and any proceeds thereof, be considered.  DE 47-1, p. 3.

The record clearly shows both the repeated, not-for-value, transfer of the website amongst and between Odenat and his entities, and that these entities are his mere alter egos, overwhelmingly meeting the standards for piercing the corporate veil.[8]  As stated in *Sonnenblick-Goldman Co. v. ITT Corp.*, 912 F. Supp. 85, 89 (S.D.N.Y. 1996) (applying Delaware law):

---

[8] Under New York choice of law principles "the law of the state of incorporation determines when the corporate form will be pierced." *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) (applying Delaware law to evaluate a Delaware corporation).  Thus, as to WORLDSTAR, LLC, Delaware law would apply, while as to WORLDSTAR HIP HOP, INC., Nevada law would apply.  As a practical matter, there is no significant difference between Nevada law, Delaware law, and New York law, all of which support piercing the veil of Defendant Odenat's entities.  *See, e.g., Harrison v. NBD Inc.*, 990 F. Supp. 179, 183 (E.D.N.Y. 1998) (similarity in standards for piercing corporate veil in New York and Delaware).

857583

> **Piercing the corporate veil . . . is permitted "where there is fraud or where
> [it] is in fact a mere instrumentality or alter ego of its owner." . . . Fraud is
> not required. Id. However, if there is no fraud then the Plaintiff must show
> (1) that the parent and the subsidiary "operated as a single economic entity"
> and (2) that an "overall element of injustice or unfairness ... [is] present."**

Veil piercing factors to consider include, "[W]hether the corporation was adequately capitalized

for the corporate undertaking; whether the corporation was solvent; whether dividends were

paid, corporate records kept, officers and directors functioned properly, and other corporate

formalities were observed; whether the dominant shareholder siphoned corporate funds; and

whether, in general, the corporation simply functioned as a facade for the dominant shareholder."

*Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. Civ.A. 1331, 1989 WL 110537, at *5 (Del.Ch.

Sept. 19, 1989).[9]   Similarly, as to Nevada law:

> **Nevada has long recognized the equitable remedy of piercing the corporate
> veil where the corporate form is abused and the corporation acts as the alter
> ego of a controlling individual**. . . The alter ego doctrine applies if "(a) **The
> corporation is influenced and governed by the stockholder, director or
> officer; (b) There is such a unity of interest and ownership that the
> corporation and the stockholder, director or officer are inseparable from
> each other; and (c) Adherence to the corporate fiction of a separate entity
> would sanction fraud or promote a manifest injustice."** Nev.Rev.Stat. §
> 78.747.

*Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1241-1242 (D. Nev. 2008).[10]

The record shows conclusively that these entities are Odenat's mere alter egos, being

used to engage in fraudulent transfers of his assets.  Odenat formed Worldstar Hip Hop, Inc. in

late 2009 and Worldstar, LLC in 2011, and has brazenly, in admittedly no-consideration

transactions, transferred ownership of the website and its income stream first to the corporation

---

[9] Similar factors are considered under New York law. *See e.g., William Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 139 (2d Cir. 1991).
[10] Factors to consider under Nevada law include: (2) commingling of funds: (2) undercapitalization; (3) unauthorized diversion of funds; (4) treatment of corporate assets as individual's own; and (5) failure to observe corporate formalities. *Lorenz v. Beltio, Ltd.*, 114 Nev. 795, 963 P.2d 488, 496 (Nev.1998).

857583

in 2009 and then, in 2011, from the corporation to the LLC.  F. ¶¶ 68-84.  There is no evidence

that either entity was capitalized in any fashion, Odenat is their sole officer and director, there is

no physical office, with each corporation sharing the same mail drop address, neither entity has

any employees, with independent contractors working interchangeably on behalf of the entities,

corporate formalities are not observed, funds are comingled and transferred between the entities

or to Odenat personally at Odenat's whim with no consideration, Odenat has sole access to and

unapologetically uses "corporate" funds as his own ("I mean, I get money when I want to get

money.  If I don't, I don't. . . . If I want, yeah, it's my money.  Right?" Q3-71-72) and his own

in-house counsel (and the corporations' designated corporate repreasentative)  admits that the

reality is that these entities are Odenat's alter ego ("But obviously given that Lee Odenat is the

top of the pyramid here, you know, it's all going to relate back to him." DC-29-30; "Because it's

a flow through . . everything lands on the personal income tax return," DC-54).  *See* F. ¶¶-68-

131.

The not-for-value transfers of the website and its income stream in the face of this lawsuit

clearly constituent "fraudulent" transfers and the misuses of the corporate forms for improper,

unjust and inequitable purposes, as to which the relief sought in the Supplemental Complaint is

entirely appropriate.  *See, e.g.*, McKinney's Debtor and Creditor Law § 275 ("Every conveyance

made and every obligation incurred without fair consideration when the person making the

conveyance or entering into the obligation intends or believes that he will incur debts beyond his

ability to pay as they mature is fraudulent as to both present and future creditors."); *Petersen v.*

*Vallenzano*, 849 F. Supp. 228 (S.D.N.Y. 1994);  McKinney's Debtor and Creditor Law § 273-a.

The fact that Odenat does not yet come within the statutory category of a "judgment debtor" who

has failed to satisfy a judgment is of no moment for present purposes, where the relief sought is

intended to thwart Odenat's attempt, during this lawsuit, to place outside of his personal possession assets pertinent to both the injunctive relief sought and to determining the appropriate *amount* of an exemplary damages judgment. As the Court has stated, there is no reason "why this fraudulent transfer claim does not serve as a basis of liability against the business entities." DE 45, p. 11.

## VIII. Plaintiffs Are Entitled To Summary Judgment As To Defendants' Affirmative Defenses.

Defendants have asserted a myriad of affirmative defenses in check-list fashion, simply listing the title of various defenses, but providing no allegations, documents or support for any of them. (DE 7, pp. 8-10; DE 48, p.3). Such mere formulaic legal conclusions with no supporting facts are entitled to no efficacy. *Shechter v. Comptroller of New York,* 79 F.3d 265, 270 (2d Cir. 1996). Plaintiff requested any documents to support each of Defendant's affirmative defenses. (D/KS, Ex. J ¶¶ 12-24). Defendant responded that any responsive documents would be produced, but, nevertheless, *no documents* were ever produced in support of *any* of Defendant's affirmative defenses. (D/KS, Ex. K ¶¶ 12-24). As detailed below, there is an absence of support for the asserted defenses, and Plaintiff is entitled to summary judgment as to each of them. *F.D.I.C. v. Giammettei***,** 34 F.3d 51, 54-55 (2d Cir. 1994).

Plainly without merit are "failure to state a claim," (no 12(b)(6) motion was ever filed, and as detailed above, Plaintiffs are entitled to summary judgment of liability on each count of the Complaint) and "lack of subject matter jurisdiction over state law claims," (clear subject matter jurisdiction over Count III and Count IV, per 28 U.S.C. § 1338(b) (unfair competition claims) and 28 U.S.C. § 1367(a) (supplemental jurisdiction over state claims)).

As with their other affirmative defenses, Defendants have formulaically raised "personal jurisdiction" without providing any supporting documents or basis. This defense is inapplicable

and unavailing, and Defendant's lack of support is understandable since the record demonstrates multiple bases of personal jurisdiction. Defendant has by, *inter alia*, his acts of copyright and trademark infringement and unfair competition "caused injury to persons or property within this State arising out of an act or omission by the Defendant outside this State" (CPLR 302(a)(3)), has, through his interactive website and other extensive New York business activities, "transacted business in New York" (CPLR 302(a)(1)), and has, by, *inter alia*, using for advertising purposes in New York, without written consent, images of Plaintiff Jackson in violation of New York Civil Rights Law §50, "committed a tortious act within this State." CPLR 302(a)(2).

Plaintiff extensively uses his trademarks, persona and copyrights in his New York based businesses. Defendant's infringement of Plaintiff G-Unit's copyrights and misappropriation of Plaintiffs' trademarks, intellectual property and goodwill to unfairly compete with the Plaintiffs' New York-based website, to cause confusion among customers, including advertisers, and the misuse of Plaintiff's image for advertising purposes all constitute tortious acts outside the state causing injury within the state, as set forth in 302(a)(3). *See, e.g., Penguin Group (USA) Inc. v. American Buddha*, 16 N.Y. 3d 295, 946 N.E. 2d 159 (N.Y. 2011) (the injury to a New York copyright holder, whose copyrights are violated on an internet website occurs in New York for purposes of CPLR 302(a)(3)); *Energy Brands Inc. v. Spiritual Brands, Inc.,* 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008)(in trademark infringement cases, injury requirement of 302(a)(3) is satisfied by harm and threatened harm resulting from actual or potential confusion and deception of internet users in New York State).[11]

---

[11]*See also American Network, Inc. v. Access America/Connect Atlanta, Inc.,* 975 F. Supp. 494, 497 (S.D.N.Y. 1997) (injury within the state prong is met by plaintiff's claims of harm in the New York market resulting from the confusion of New York computer users who viewed infringing mark on defendant's website).

In addition to causing injury in the state, both 302(a)(3)(i) and 302(a)(3)(ii) are satisfied, although only one of these two subsections must be met.[12] As to subsection (i), it is established that Defendant regularly does or solicits business in New York, and in fact New York was the first place Defendant mentioned when asked where he travels most frequently to conduct business. Q4-11. The financial records produced also show extensive and repeated transactions involving New York customers and activities. D/KS-¶4. As to subsection (ii), Odenat undisputedly derives substantial revenue from interstate commerce, and should reasonably have expected his conduct, which has specifically targeted Plaintiff's New York businesses and website, to have consequences in the state. As stated in *Energy Brands Inc. v. Spiritual Brands, Inc.,* 571 F. Supp. 2d 458, 467 (S.D.N.Y. 2008):

> It is reasonably foreseeable that the provision of materials that infringe the copyrights and trademarks of a New York company will have consequences in New York, *see Citigroup Inc. v. City Holding Co.,* 97 F. Supp. 2d 549, 568 (S.D.N.Y. 2000), and the defendant derives substantial revenue from international commerce. New York's long-arm statute is therefore satisfied

*See also, Mrs. U.S. Nat. Pageant, Inc. v. Miss U.S. Org., LLC,* 875 F. Supp. 2d 211, 223 (W.D.N.Y. 2012) ("wrongdoer should reasonably anticipate being called to answer for its conduct wherever the results of that conduct are felt;" purposeful availment and expected consequences where "defendant individually targeted [plaintiff] by misusing his intellectual property on the defendant's website for the purpose of competing with the plaintiff in the forum.") The reasonable foreseeability of being haled into Court in New York is further established by the Defendant's specific targeting of Plaintiff's New York business by the use of the domain names containing "G-Unit" and "thisis50" in an outrageous effort to unfairly compete with Plaintiffs. *Id.*

---

[12] See CPLR 302(a)(3) jurisdiction if defendant: (i) regularly does business, engages in any other persistent conduct, or derives substantial revenue (302(a)(3)(i)) ***or*** (ii) should reasonably expect the act to have consequences in the state and derives substantial revenue from commerce (302(a)(3)(ii)).

Personal jurisdiction is also proper under 302(a)(1). Not only does Defendant's website target New York via the misuse of Plaintiff's intellectual property, it is an interactive website. D/KS-¶ 10. *See, e.g., Hsin Ten Enter. USA, Inc. v. Clark Enters.,* 138 F. Supp. 2d 449, 456 (S.D.N.Y. 2000) ("Generally, an interactive website supports a finding of personal jurisdiction over the defendant."). Moreover, Defendant has transacted a great deal of business associated with the website in New York, including entertaining clients in New York, hiring video producers and transactions with advertisers . Q4-11; D/KS-¶ 4.[13]

Finally, the assertion of "lack of personal jurisdiction" by the Defendants to the Supplemental Complaint is equally unavailing. These Defendants, formed after this action was filed, are the alter egos of Defendant Odenat, over whom there is personal jurisdiction. *See, e.g, SEC v. Montle,* 65 Fed. Appx. 749, 753 (2d Cir. 2003) ("Inasmuch as personal jurisdiction exists over Haryman, jurisdiction over his alter ego is proper as well."). Moreover, these entities have been participants in the above mentioned fraudulent transfers and, additionally, Defendant has used financial accounts in the name of these entities to transact substantial New York business. D/KS-¶ 4.

Also meritless and without support are the affirmative defenses specifically pled only as to the copyright claim (Count V for the unauthorized reproduction and display of G-Unit's copyrighted photographs), to-wit, "lack of standing to bring claim for copyright infringement," "claim for copyright infringement is barred by the statute of limitations," "claim for copyright infringement is barred by laches," "Plaintiff lacks the necessary ownership rights to bring their copyright infringement claim." DE 7, pp. 8-9. With respect standing and ownership, Plaintiff G-

---

[13] Due process is also satisfied, as it is clear based on the above, there are "minimum contacts" with New York, *see International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154 (1945), purposeful availment of the privilege of conducting activities with the forum state, see *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228 (1958), and the conduct and connection are such that Defendant should reasonably anticipate being haled into court here, see *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567 (1980).

Unit Records is the rightsholder of the two images at issue, along with Universal Records. D/SH-¶¶ 2-3.  Co-owners have equal rights to pursue copyright infringement claims. *See, Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007).  Regarding statute of limitations/laches, the statute of limitations for copyright infringement claims is 3 years.  *See* 17 U.S.C. § 507(b).  The image which forms the basis for the copyright claim (Masthead #2) was being displayed at least as recently as August 2006, as reflected on, *inter alia*, Exhibit B to the Complaint (DE 1, p. 21)/Mondesir Ex. 2 .  This action was filed in June of 2009.  There is no statute of limitations issue.  Similarly, Defendant has provided no support for the equitable defense of laches.  *See, e.g., Steinberg v. Columbia Pictures Industries, Inc.*, 663 F. Supp. 706, 716 (S.D.N.Y. 1987) (party asserting laches must show that the opposing party 'did not assert their rights diligently... result[ing] in prejudice to them' *quoting Lottie Joplin Thomas Trust v. Crown Publishers, Inc.*, 592 F.2d 651, 655 (2d Cir. 1978)).

With regard to the assertion of "fair use," no explanation for the inclusion of this defense has been provided.  To the extent this defense is intended to be directed to the copyright claim, there is nothing to suggest how Defendant's use of the two copyrighted photographs as the primary source identifier for his website was somehow for purposes of "criticism, comment, news reporting, teaching, scholarship, or research" as set forth in the Copyright Act's fair use provision. See 17 U.S.C. § 107.  Every commercial use of copyrighted material is presumptively an unfair exploitation of a copyright owner's monopoly.  *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 451, 104 S.Ct. 774, 793 (1984).  To the extent "fair use" may be intended to be directed to the trademark claims, there is no basis to contend that the Defendant's use of G-UNIT or the image of 50 Cent to benefit from the goodwill of those marks somehow constituted a good-faith, "non-trademark" use of those items, for descriptive purposes. *See, e.g.,*

31

15 U.S.C. §1115(4);  *TCPIP Holding Co., Inc. v. Haar Communications, Inc.*, 244 F.3d 88, 103-104 (2d Cir. 2001) (trademark "fair use doctrine" only applies to use of mark in good faith in its descriptive sense, and not as a trademark).

In addition to "fair use," Defendant has, inconsistently, asserted as an "affirmative defense" that the "trademark and unfair competition claims are barred by the doctrine of nominative fair use."[14]  As with all of the asserted defenses, only the title is alleged, no factual basis is pled, and no supporting documents were produced.  Apparently, Defendant may claim that "nominative fair use" applies to the trademark claims (Counts I and II) and the state unfair competition claim (Count IV), and thus to all of the improper conduct alleged.

"Nominative fair use" is wholly inapplicable.  First, it is not actually an "affirmative defense," but rather a doctrine originated by the Ninth Circuit as an alternative means to test for likelihood of confusion in certain cases.  *See, e.g.*, McCarthy § 31:156.50 (4th ed.) ("The Ninth Circuit did not intend nominative fair use to constitute an affirmative defense . . . merely an alternative way to test likelihood of confusion.").  Moreover, the Second Circuit recently held in *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102-103 (2d Cir. 2010), that this Circuit has neither adopted nor rejected the doctrine, and had no need to consider its viability, because its existing "likelihood of confusion" test is sufficient, including in cases where a defendant uses a plaintiff's trademark to refer to the plaintiff's own product:

> The doctrine of **nominative fair use** allows "[a] defendant [to] use a plaintiff's trademark to identify the plaintiff's goods <u>so long as there is no likelihood of confusion about the source of [the] defendant's product or the mark-holder's sponsorship or affiliation.</u>"  . . .<u>We have referred to the doctrine, albeit without adopting or rejecting it.  . . We need not address the viability of the doctrine</u> to resolve Tiffany's claim, however. We have recognized that a defendant may lawfully use a plaintiff's trademark where doing so is necessary to

---

[14] "Fair use" applies to a defendant's use of a plaintiff's mark to refer only to defendant's own product, while "nominative fair use" applies to a defendant's use of a plaintiff's mark to refer only to plaintiff's product. *See, e.g,* *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 903-04 (9th Cir. 2003).

describe the plaintiff's product and **does not imply a false affiliation or endorsement by the plaintiff of the defendant.**

The nominative fair use doctrine would be inapplicable here even if the Second Circuit had adopted it, however.  The doctrine applies only to "a class of cases where the use of the trademark does not attempt to capitalize on consumer confusion or to appropriate the cachet of one product for a different one . . . does not imply sponsorship or endorsement" and "is used in a way that does not deceive the public." *New Kids on the Block v. News America Pub., Inc.*, 971 F.2d 302, 307-308 (9th Cir. 1992).  "An example of this type of use would be where an automobile repair shop specializing in foreign vehicles runs an advertisement using the trademarked names of various makes and models to highlight the kind of cars it repairs." *See New Kids On The Block, supra*, 306–07 (9th Cir.1992) *citing Volkswagenwerk Aktiengesellschaft v. Church,* 411 F.2d 350 (9th Cir. 1969).

An after-the-fact attempt by Defendant to argue that he only used the "G-Unit" mark and all of the other uses of Plaintiff's images in order refer to G-Unit mixtapes that were available on Defendant's website is belied by the record.  First, such a contention is inconsistent with Defendant's candid admission that his intention was simply to feature some of the biggest names in hip-hop in order to take advantage of their prominence, and that he so instructed his masthead designer. Q1-25; Q2-22.  Nor did Defendant respond to Plaintiff's cease and desist letter that Defendant's uses of Plaintiff's intellectual property were proper, or "nominative" or "fair."  Second, it is clear that rather than a limited use, Defendant did much more than would be necessary to identify G-Unit mixtapes, giving G-Unit its own separate button incorporated into the workings of the website, centered at the top of the website's masthead featuring images of G-Unit members, and with all of the content below the masthead devoted solely to G-Unit mixtapes.  It can hardly be considered "nominative fair use" when the "look" of the entire

33

website at that time was deliberately made to look as though it was an entire G-Unit site. *See e.g.,* McCarthy § 23:11 (4th ed.) ("the junior user may step over the line into a likelihood of confusion by using the senior user's mark too prominently" or with too much "emphasis"). The obvious inapplicability of this defense is further bolstered by a comparison of other mixtape sites that have carried the G-Unit mixtape series known as "G-Unit Radio." D/AS¶ 27. The difference is dramatic and dispositive. S*ee, e.g., Audi AG v. Shokan Coachworks, Inc.,* 592 F. Supp. 2d 246, 270 (N.D.N.Y. 2008) (summary judgment ruling nominative fair use inapplicable where "each of the alleged infringing uses could imply sponsorship by Plaintiffs of Defendants").

With regard to Defendant's affirmative defenses of "license," "estoppel," "waiver" and "acquiescence," no evidence has been provided to support such defenses, nor is there any allegation as to which claim or claims are purportedly covered. Defendant bears the burden of establishing any such defenses. *See, e.g., ProFitness Physical Therapy Center v. Pro-Fit Orthopedic and Sports Physical Therapy, P.C.,* 314 F.3d 62, 67 (2d Cir. 2002); *Mooney v. City of New York*, 219 F.3d 123, 131 (2d Cir. 2000); *AT & T Corp. v. Microsoft Corp.*, No. 01-4872, 2004 WL 188078 (S.D.N.Y. Feb. 2, 2004). All of these so-called defenses, according to Defendant's counsel (DE 19), are based on Odenat's purported claim that he was somehow permitted to utilize 50 Cent's image repeatedly because permission had purportedly been granted to do so by Whoo Kid. This defense is neither supported by the facts or law. First, Odenat has been vague and contradictory in his testimony concerning any representations made by Whoo Kid concerning "consent" to use 50 Cent's image and, in fact, has repeatedly testified that 50 Cent's image was never chosen by him (which it would have been had he believed he had permission to) but was rather randomly chosen by various unnamed graphic artists with the

instructions to simply choose "the most popular" artists, or to use "Whoo Kid," or to choose "something futuristic." Had Odenat truly believed he had permission to utilize 50 Cent's image, he would have instructed his various unnamed graphic artists to use 50 Cent's image. Odenat has further testified that he never had any specific discussions with Whoo Kid about utilizing 50 Cent's image on the masthead and never got his approval of any of the mastheads. Of course, Whoo Kid denies ever telling Odenat that Odenat could use 50 Cent's image on his website. WK-45. And, as stated previously, Whoo Kid has at all times been an independent agent and never had authority to grant anyone permission to utilize 50 Cent's image for any purpose. The simple fact is that no permission was ever granted, either by 50 Cent or wrongfully by Whoo Kid. Ultimately, this defense is legally unavailing because, as noted above, a mistaken belief of "permission" does not excuse one from liability.[15]

Finally, with regard to Defendant's affirmative defense of "unclean hands," Plaintiff has no idea what the possible basis is of Defendant's affirmative defense in this regard and would challenge Defendant to come forward with evidence of some unconscionable act by Plaintiff which would support such a defense to equitable relief. *See, e.g., Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services,* 746 F. Supp. 320, 329 (S.D.N.Y. 1990).

---

[15] Odenat further claims that Jackson saw Image # 1 (50 Cent robot) on Odenat's website while Odenat was in G-Unit's New York offices in October of 2008 (Odenat says for a "meeting;" DJ Whoo Kid says Odenat came by to see him and Jackson "happened" to be there at the same time) and that Jackson said he liked the robot image and wanted Odenat to leave it up, even over Odenat's protestations to the contrary. Q1-49-50; 173-174; WK-63. No one in attendance has corroborated this story. Odenat's self-serving, uncorroborated claim that Jackson would approve the use of his image for free by a direct competitor is so manifestly against economic sense, and so implausible, given the endorsement value of Plaintiff's image and consistent efforts to utilize and protect his intellectual property rights, (including the *Taco Bell* and *Coco Bongo* cases at the time--*See, Curtis James Jackson v. Taco Bell Corp.,* Case No. 08-06545(S.D.N.Y.) and *Curtis James Jackson v. Grupo Industrial Hotelero, S.A., d/b/a "Coco Bongo,"* Case No 07-22046 (S.D. Fla.)) that it should not be deemed to create an issue of material fact for summary judgment purposes. See, e.g., *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348 (1986) ("[I]f the claim is one that simply makes no economic sense-[the parties opposing summary judgment] must come forward with more persuasive evidence to support their claim than would otherwise be necessary."); *Ostrander v. Accelerated Receivables*, No. 07-827, 2009 WL 909646 *4 (W.D.N.Y. Mar. 31, 2009) ("While the court may not assess credibility on summary judgment, if the evidence is contradictory or implausible, it may be disregarded.").

Respectfully submitted,

Michael Cardello , III
Moritt Hock Hamroff & Horowitz LLP
400 Garden City Plaza, Suite 202
Garden City , NY 11530
Ph:     (516) 873-2000
Fax:    (516)-873-2010

and

GrayRobinson, P.A.
*Attorneys for Plaintiffs*
1221 Brickell Avenue
Suite 1600
Miami, FL 33131
Telephone: (305) 416-6880
Facsimile: (305) 416-6887

By: /s/Karen L. Stetson
Karen L. Stetson
Florida Bar No. 742937
Jonathan L. Gaines
Florida Bar No. 330361

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished

U.S. Mail to: Scott Zarin, Zarin & Associates, P.C., Zarin & Associates P.C., One Penn Plaza,

Suite 4615, New York, NY 10119 and to Yves Mondesir, 135 Clarken Drive, West Orange, NJ

07052 this 18th day of January, 2013.

By:     s/Karen L. Stetson

857583