UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
CASE NO. 1:09-CIV-05583 (JFK) (GWG)

CURTIS JAMES JACKSON, III
p/k/a 50 CENT, TOMORROW
TODAY ENTERTAINMENT INC.,
a New York corporation, and
G-UNIT RECORDS, a New York
corporation,

      Plaintiffs,

      v.

LEE Q. ODENAT, a/k/a "Q," d/b/a
WWW.WORLDSTARHIPHOP.COM,
WORLDSTAR HIP HOP, INC., a Nevada
Corporation; WORLDSTAR, LLC, a Delaware
limited liability company; WSHH337, LLC,
a Delaware limited liability company;
JOHN DOE LLC(S)/CORPORATION(S)

      Defendants,

      v.

YVES MONDESIR,

      Third-Party Defendant.
_____/

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO MOTION IN LIMINE TO EXCLUDE
<u>EXPERT REPORT OF ARAM SINNREICH</u>**

Plaintiffs CURTIS JAMES JACKSON, III p/k/a 50 CENT, TOMORROW

TODAY ENTERTAINMENT INC., a New York corporation, and G-UNIT RECORDS,

a New York corporation, by and through undersigned counsel, file this Memorandum in

Opposition to Motion In Limine to Exclude Expert Report of Aram Sinnreich, and state:

# 1516853 v1                                    1

>   a. **Sinnreich's Opinions Were Properly Disclosed and Defendants' Arguments for Exclusion Are Primarily Matters for Cross-Examination and Which Defendants Could Have Explored Via Deposition But Chose Not To**

Preliminarily, it appears that Defendants seek to exclude Aram Sinnreich's expert report[1] in its entirety based upon contentions that, in Defendants' view, the report does not contain sufficient information as to various issues Defendants would like to have Sinnreich address more fully than in the report itself.  However, Sinnreich's Reports are proper and in compliance with Rule 26(a)(2)(B), containing complete statements of Sinnreich's opinions and the bases therefor, eliminating any possibility of unfair surprise to Defendants.  Defendants, as detailed below, primarily raise issues going to the weight of testimony, appropriately addressed via cross-examination, not exclusion.  Significantly, despite ample opportunity to do so, <u>Defendants chose *not* to take Sinnreich's deposition</u> following the issuance of his reports, thereby foregoing the chance to have Sinnreich elaborate upon and further explain his opinions.  As stated in *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 643 F. Supp. 2d 471, 482 (S.D.N.Y. 2009):

> The purpose of an expert report is to eliminate "unfair surprise to the opposing party." . . .  However, "<u>**[s]ection 26(a)(2)(B) does not limit an expert's testimony simply to reading his report .... The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report**</u>."  Thus, the

---

[1] Two Sinnreich Reports were provided to Defendants, one dated May 26, 2011, and an Amended Report dated August 25, 2011.  Additionally, certain of Sinnreich's opinions were further detailed in his Declaration filed in support of Plaintiffs' Motion for Partial Summary Judgment (DE 125).  The Reports share Exhibits 1 through 10 in common.  The August 25, 2011 Report also contain an Exhibit 11, which Plaintiff believes was provided to Defendant with the Report, and an additional copy of Exhibit 11 is being provided to Defendant at this time.  Defendant's Motion asserts for the first time that Defendant did not originally receive Exhibit 11, although there has never been any mention from Defendant during the intervening three years that the Exhibit was not provided.  In any event, the significant contents of Exhibit 11 (the url's on Defendant's server containing "thisis50" and "g-unit") were set forth in the body of the Report.

> issue is whether Tallett's report is substantially complete and any omissions are either justified or harmless.

(emphasis added).  *See also, Thompson v. Doane Pet Care Co.*, 470 F. 3d 1201, 1203 (6th Cir. 2006).

> Section 26(a)(2)(B) does not limit an expert's testimony simply to reading his report. No language in the rule would suggest such a limitation. The rule contemplates that the expert will supplement, elaborate upon, explain and subject himself to cross-examination upon his report. **Parties may ordinarily seek permission to depose such experts prior to trial, if necessary. No such request was made in this case.**

*See also*, Rule 26(b)(4), Fed. R. Civ. P., providing that a party may depose any expert, and, "If Rule 26(a)(2)(B) requires a report from the expert, the deposition may be conducted only after the report is provided." *Barta v. Sears, Roebuck and Co.*, 307 F. Supp. 2d 773, 783 (E. D. Va. 2004) (refusing to strike expert where report "substantially complied with requirements of that rule" and complaining party "had opportunity to fully depose those experts and explore full nature of their opinions and qualifications").

In light of Defendants' contention that, for a variety reasons, Mr. Sinnreich's reports and opinions should be excluded entirely, Plaintiffs will address each of Mr. Sinnreich's opinions and Defendants' arguments as to exclusion in turn.

    b.    **Opinions regarding Defendants' Website's Revenue/Traffic/Market Value**

Sinnreich was retained by Plaintiffs to, in part, render an opinion of the value of the website at issue, worldstarhiphop.com.  The purpose of estimating the value of Defendant's website is to assess exemplary damages, which Plaintiffs are seeking with respect to the right of publicity claim as to which summary judgment of liability has

previously been entered.[2]  While the website is not Odenat's only asset, it is his single greatest asset.

In this context, the valuation need not be as precise as may be required in other contexts, such as if Plaintiffs were seeking the loss of the website itself as compensatory damages.  Sinnreich has, therefore, applied his expertise to publicly available information in a rational fashion to derive a "ball park" estimate of the website's market value of the website, *i.e.*, what an investor would be willing to pay for such an asset.  Sinnreich, 8-25-11 Report, pp. 1-8.  Such an estimate is appropriate here, given the inherent nature of punitive damages awards and the difficulty which can be faced when having to rely, for "net worth," on information within a defendant's control, particularly where, as here, the defendant is uncooperative, evasive and has historically not engaged in the type of record-keeping to be expected from a business enterprise.  *See, e.g, Payne v. Jones,* 711 F. 3d 85, 93 (2d Cir. 2013). "Awards of punitive damages are by nature speculative, arbitrary approximations." *See also, Motorola Credit Corp. v. Uzan*, 509 F. 3d 74 (2d Cir. 2007) (applying Illinois law):

> The district court made every effort to determine defendants' financial condition based on all available sources. It did so in the face of the Uzans' refusal to help in any meaningful way. The court found that a reasonable estimate of appellants' net worth was at least $5 billion. It began with a *Forbes* estimate that the Uzans' net worth was $1.5 billion in 2004. The court noted that while the *Forbes* figure reflected "rough estimates at best, [they] were made by a disinterested third party" . . . In addition, the court, relying on a wide range of news sources, found that the Uzans also possessed or jointly controlled between $5 billion and $6 billion in assets . . . the court concluded that "the secretive and labyrinthine manner in

---

[2] Section 51, of the New York Civil Rights Law, provides: "[I]f the defendant shall have knowingly used such person's name, portrait, picture or voice in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages."  For purposes of assessing exemplary damages, it is appropriate to consider the Defendant's net worth at the time of trial. *See, e.g., Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 267 (S.D.N.Y. 1999) ("Courts have also been instructed to consider the wealth of the defendant, because that punitive damages are meant to punish and deter defendants and others from similarly willful or outrageous misconduct.").

> which the individual defendants operated their complex financial empire makes it likely that they retain access to substantial assets even while some of them are occupying fugitive status. . .Under the circumstances, we cannot say that the court's <u>estimate</u> that the Uzans' net worth was at least $5 billion, was erroneous.

*See also, e.g., Lemmon v. Wyeth, Inc.*, No. 04-1302, 2012 WL 2848671 (E. D. Mo. July 11, 2012), in which the Court denied a similar motion to preclude expert testimony as to net worth in the punitive damages context:

> In their challenge to Dr. Maloney's and Dr. Hartman's net worth testimony, Defendants argue that the experts' method of estimating Wyeth's net worth is a market capitalization calculation that is "not tied to, and does not provide any evidence of, Wyeth's net worth." They further assert that the testimony will serve only to confuse and mislead the jury, claiming that "market capitalization is not a reliable method of calculating net worth, does not comply with Dr. Maloney's own definition of net worth, and does not satisfy the *Daubert* standard." Plaintiffs' experts have supplied an analysis of the economic principles used in determining their net worth calculations. According to Dr. Hartman, market capitalization provides an "upper bound" valuation in determining a firm's ability to pay any punitive damage award, and is the most readily available measure of its market value.
>
> **<u>Defendants' challenge here attacks the evidence's weight, rather than its admissibility; thus, the probative value of the expert's testimony is a matter for the trier of fact to resolve, and any weakness in the evidence may be more appropriately exposed by cross-examination or presentation of contrary evidence.</u>**

Certainly, Defendants are free to cross-examine Sinnreich as to his analysis and advance their own arguments, and, if claiming that net worth will not support a punitive damages award, will have the burden of so proving. *See, e.g., Smith v. Lightning Bolt Prods.,* 861 F. 2d 363, 373 (2d Cir. 1988) ("The incompleteness of the record as to [defendant's] net worth is not a basis for reducing the punitive damages award against him, for it is the defendant's burden to show that his financial circumstances warrant a limitation of the award."); *Zarcone v. Perry,* 572 F.2d 52, 56 (2d Cir. 1978) ("It is true that without ...

evidence [of defendant's net worth] no one can be sure of the severity of the monetary sanction that the jury imposed. A $60,000 award may bankrupt one person and be a minor annoyance to another. But the decided cases and sound principle require that a defendant carry the burden of showing his modest means—facts peculiarly within his power—if he wants this considered in mitigation of damages.").

   Mr. Sinnreich (who, again, Defendants chose not to depose in this case) is well-qualified to offer such opinions, having vast experience counseling potential investors in the value of websites and whether to make investments in websites. Report, pp. 1, 7. This sort of "strategic analysis" or "strategic valuation" has been permitted by other courts. *See, e.g., Hansen Bancorp. Inc. v. United States*, 67 Fed. Cl. 411, 413 n.3 (2005). In evaluating these issues, Sinnreich relied on his twenty years of experience as a researcher, author, consultant and educator focusing on media, culture, law, and technology. That experience includes consulting work on behalf of media and technology companies regarding issues affecting the media and technology industries. There is no question that an expert may properly base his testimony on "professional study or personal experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 151 (1999). In fact, the inquiry into an expert's qualifications is not stringent, and "the standard for qualifying expert witnesses is liberal. Assertions that the witness lacks particular educational or other experiential background, go to the weight, not the admissibility, of [the] testimony." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir. 1995). If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the purported ground that the witness lacks expertise in the specialized areas

that are directly pertinent.  *See, e.g., Stagl v. Delta Air Lines, Inc.,* 117 F.3d 76, 80 (2d Cir. 1997).  *See also* Fed. R. Evid. 702, advisory committee's note on 2000 amendment (witness may qualify as an expert relying solely or primarily on experience).

Each step undertaken in this regard, *i.e.*, Sinnreich's methodology, is precisely the same as he has undertaken for numerous clients.  Certainly, the research tools he used including Alexa.com, Hitwise.com and Compete.com (other than the obvious fact that they are specifically established as research tools) are extensively utilized and relied upon by others in Sinnreich's fields on a regular basis.  See, Declaration of A. Sinnreich, attached hereto as Exhibit A.

The revenue information Sinnreich relies upon is based on information contained on Odenat's *own* website.  If Odenat wants to take the position that the information on his website is untrue, he is certainly free to argue that to the jury.   Sinnreich is, however, certainly qualified to render the opinion, the opinion is relevant for punitive damages, is based on publicly available information including research materials utilized by others in the field and Odenat's own website.

   c. **Wayback Machine/Relevance**

Sinnreich next opined that Odenat removed archival information about his website, specifically images that would show what worldstarhiphop.com looked like and displayed during the period of infringement, from the Wayback Machine, and that the information was removed from the archival site <u>after this lawsuit was filed</u>.   Defendants argue that this opinion is irrelevant or, alternatively, no expert is needed as a lay person could determine this on his or her own.

As to the first point, relevance, Sinnreich's conclusion is relevant because the removal of the archival images prevented Plaintiffs from determining whether there may have been other unauthorized uses of Plaintiffs' images or trademarks than those sued on, prevented Plaintiffs from gathering copies of images that could have been useful to present to the jury concerning the infringements they did know about, and prevented Plaintiffs from learning specifics about whatever commercial and advertising efforts were employed by the website during the period of infringement.  Plaintiffs are entitled to argue that there is at least an inference that Defendants were purposefully "hiding" something by blocking access to the Wayback Machine.  *See e.g., Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 478 n. 24 (S.D.N.Y. 2003):

> **A party's failure to preserve relevant evidence can support an inference that the evidence would have been unfavorable to the party responsible for its destruction**. *See Reilly v. Natwest Mkts. Group,* 181 F.3d 253, 267–68 (2d Cir. 1999). The party seeking to draw the negative inference must show that the evidence is relevant to a contested issue, that the party with control over the evidence had an obligation to preserve it at the time it was destroyed, and that the evidence was intentionally destroyed.

As to the second point, an expert's opinion should be excluded on that ground only if  "the expert could offer nothing beyond the understanding and experience of the average citizen." *United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985); Federal Rule of Evidence 702, Commentary (test for appropriateness of expert testimony is "whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.").  Plaintiffs simply do not agree that the typical lay person could know where and how to search to determine whether material has been "blocked" from the Wayback Machine (which is the most

reliable way of seeking the past history of a webpage where, as here, the website owner maintained no back-up files), and would not ordinarily know that the method of blocking here could *only* be accomplished by a specific request by the website owner.  Plaintiffs needed an expert to be able to uncover and explain this evidence and the jury will need Sinnreich to explain it as well. *See, e.g., In re Zyprexa Products Liability Litigation*, 489 F. Supp. 2d 230, 283 (E.D.N.Y. 2007) ("Freely admitted is expert testimony that is likely to substantially assist the average person in understanding the case—even if it simply explains facts and evidence already in the record.").

> d. **Continuing Disproportionate Association between Jackson and worldstarhiphop.com**

Sinnreich next opined that there is a disproportionate association between Jackson and worldstarhiphop.com as compared with websites that can be considered competitors of worldstarhiphop.com.  According to Sinnreich:  "This is true despite WSHH's current absence of overt association with 50 Cent, and despite the fact that it hosts less 50 Cent-related content than some of its competitors."   See Affidavit in Support of Motion for Summary Judgment at paragraph 23.  The obvious significance of such an opinion is to show that worldstarhiphop.com continues to enjoy the fruits of the earlier years of infringement, i.e., an association with Jackson and his brand, even beyond the date that the images were removed from its masthead.  This is an important point Plaintiffs wish to make to the jury when it is considering an appropriate license fee.

Defendants argue that Sinnreich's report should be excluded because it does not take into account the possibility of other factors that may be the reason for the disproportionate association.  However, Sinnreich does, in fact, evaluate and take into consideration the extent of 50 Cent-related content on Defendants' website *vis-a-vis*

competitive websites.  Thus, Sinnreich considered and accounted for the most obvious possible alternative explanation, *i.e.* that there might be a greater association because there was actually more 50 Cent content on Defendants' site.  He determined that the association with 50 Cent was greater with Defendants' site despite there being *less* 50 Cent content present on the site.  Other "factors" considered and/or rejected could have been explored at a deposition but their omission does not render Sinnreich's report deficient and those matters can be explored at trial.  *See, e.g., Ambrosini v. Labarraque*, 101 F.3d 129 (D.C. Cir. 1996) (the possibility of some uneliminated causes presents a question of weight, so long as the most obvious causes have been considered and reasonably ruled out by the expert).

The Court noted in the context of the parties' summary judgment motions that Sinnreich's report in this regard was "not conclusive" to establish actual confusion. Plaintiffs assume that while the Court viewed the report on this issue to be inconclusive on the issue of actual confusion in the marketplace for summary judgment purposes, Plaintiffs can present it to the jury who can then weigh the persuasiveness of the evidence subject to cross-examination.  Moreover, Plaintiffs intend to utilize this opinion for purposes of damages to show that Defendants continue to receive a benefit from their past infringing activities.[3]  Of course, a district court's gate-keeping function under *Daubert* is not intended to supplant the adversary system or the role of the jury. According to *Daubert*, '[v]igorous cross-examination, presentations of contrary evidence

---

[3] As liability had not been established at the time of Sinnreich's report or declaration, Sinnreich neutrally referred to the Defendants' infringing activities as "branding and marketing initiatives" as he was not retained to opine on the ultimate issue in the case, whether Defendants' activities in this regard were unlawful.

and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.[4]

### e. Other Mixtape Sites

Sinnreich next opined that, based on his research, other mixtape websites did not contain as many references to G-Unit Radio as did worldstarhiphop.com, nor did they devote the entire front page to G-Unit Radio as did worldstarhiphop.com, nor did they contain single-artist navigational elements in the form of a tab above the masthead as did worldstarhiphip.com.[5]

As the Court will recall in the context of the parties' motions for summary judgment, Odenat contends that his use of the trademark G-UNIT constitutes "nominative fair use." The Court concluded that while nominative fair use is not an affirmative defense per se, it can be considered within the overall likelihood of confusion analysis. Yet, astoundingly, Defendants make the statement that: "No 'likelihood of confusion' factor relevant to Plaintiffs' trademark claims, which are the only claims remaining on which a fact-finder must decide liability, implicates the use of the trademarks at issue by third party websites. Indeed, Defendants have trouble understanding why Plaintiffs believe use by third-parties has any relevance to any claim in this action." The very evidence Defendants now wish to exclude was specifically presented to the Court by Plaintiffs and argued in support of their motion for summary judgment yet Defendants profess to not have any understanding as to its relevance. This evidence is highly relevant and highly damaging to Defendants' position in this case that "everyone" else's

---

[4] Plaintiffs do not meant to suggest that Sinnreich's testimony is "shaky," and read *Daubert*'s use of the phrase as simply "not conclusive."
[5] In fact, it should be noted that the single-artist (G-Unit) branded navigational element in the form of a tab above the masthead appeared at the top of the "front page" of worldstarhiphop.com as well as at the top of **every** interior page of the website.

# 1516853 v1            11

mixtape sites were using the G-UNIT trademark in the same manner as worldstarhiphop.com did, when just the opposite is true. Indeed, <u>it was precisely this testimony by Odenat</u> that prompted this research to be performed by Sinnreich at Plaintiffs' request. Nor is the appearance and operation of other mixtape sites during the period of infringement – information which Sinnreich had to locate and gather using various research tools and techniques -- a matter of "common knowledge" or readily available to the layman. It is appropriate under Rule 702 for Sinnreich to explain and present the results of his research to the jury.

      Defendants next attack Sinnreich's methodology and, specifically, that it is based on too small a "sample size." First, Defendants never deposed Sinnreich so there is no evidence one way or another as to whether the three examples Sinnreich specifically discusses are three of hundreds of examples or three of six examples. Defendants have certainly put forth no evidence as to how many "mixtape sites" existed either at the time of the infringements or at any time subsequent. Sinnreich, having stated his opinions and the basis therefor, was not required in his report to elaborate upon every step undertaken in the course of his research, although Defendants could have certainly sought that information through a deposition had they considered that important. In fact, as Odenat is no doubt well aware, Sinnreich used the biggest mixtape sites that were in existence during the relevant time period. This is simply an attempt to exclude damaging evidence on the merest suggestion that it "might" not be based on a sufficient sample without any factual basis therefor.

      Defendants further assert, "Even if Mr. Sinnreich's opinion regarding Defendants' purported excessive and prominent use of the 'G-Unit' trademark, relative to other

similar websites, is admissible pursuant to Rule 702, the evidence upon which it is based, webpages allegedly from the websites datpiff.com, mixtapepass.com and hiphopdx.com derived from the Wayback Machine, is not admissible under Rule 703 because the pages have not been authenticated." Defendants' Motion p. 18.

First, as Defendants appear to recognize, Sinnreich is permitted to base his opinion on the pages from the WayBack Machine, whether or not they are themselves deemed admissible, where, as here, experts in the field would rely upon such data. Rule 703 provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. <u>If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted</u>. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

It is recognized that experts in the field rely upon the Wayback Machine. For example, in *Member Services, Inc. v. Sec. Mut. Life Ins. Co. of New York*, No. 06-1164, 2010 WL 3907489 *24 (N.D.N.Y. Sept. 30, 2010) the Court denied a motion to exclude expert testimony premised upon the Wayback Machine, stating:

> The Internet has become a source of reliable information both for courts and experts. *See Alfa Corp. v. OAO Alfa Bank,* 475 F.Supp.2d 357, 361 (S.D.N.Y.2007); *United States v. Paracha,* 2006 WL 12768, at * 17–21 (S.D.N.Y. Jan.03, 2006), *aff'd* 313 Fed. Appx. 347 (2d Cir.2008). Further, Plaintiffs **have not demonstrated that the information obtained from the *WayBackMachine* website is unreliable or that experts in the field would not reasonably rely on the data obtained from this website**. *See* Fed.R.Evid. 703. Accordingly, the **motion to preclude Mr. Tingle from testifying in this regard is denied,** but Plaintiffs may renew the argument at trial if Security Mutual is unable to demonstrate the reliability of the information.

The Court itself has relied upon the Wayback Machine as a recognized source of archived versions of websites. *See, e,g, Gucci America, Inc. v. Frontline Processing Corp.,* 721 F. Supp. 2d 228, 237, n.1 (S.D.N.Y. 2010) (stating, "*See* TheBagAddiction.com, http:// www. The Bag Addiction. com. This site can longer be accessed because it was shut down following Gucci's lawsuit, but archived versions of the website can be browsed at The Internet Archive **Wayback Machine**. *See* http:// web. archive. org/ web/*/ http:// the bag addiction. com (last visited May 23, 2010.").[6]

      With regard to the admissibility of the screen shots from the Wayback Machine, there has been no prior issue raised by Defendants as to the authenticity of the screen shots attached to Sinnreich's report or to his Declaration filed in support of Plaintiffs' Motion for Summary Judgment (DE 125). These screen shots were properly before the Court as part of the summary judgment record. *See, e.g., Prime Ins. Syndicate, Inc. v. Damaso*, 471 F. Supp. 2d 1087 (D. Nev. 2007) (documents submitted in support of summary judgment motion that were not properly authenticated could nonetheless be considered where non-moving party did not challenge their authenticity and where documents' appearance and contents supported authentication). It has appeared, up until the present Motion, that there was no dispute as to such documents' authenticity, rendering further authentication under Federal Rule of Evidence 901 unnecessary. Indeed, screen shots from the WayBackMachine have been used throughout this matter,

---

[6] See also, *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 630 (E.D. Pa. 2007), where the Court provided a detailed explanation of the operation of the WayBackMachine "by way of background" describing how it provides "a window into the past where users can see what a website looked like on a specific date."

including with regard to images of the infringing mastheads, the authenticity of which Odenat has admitted.

Rule 901 provides "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  To the extent Defendants are now refusing to concede the authenticity of these documents, as they had previously done for summary judgment purposes, Rule 901 is satisfied by the provision of a declaration from an employee archive.org, that is similar to a records custodian declaration.  The website provides a standard affidavit of authenticity specifically for such purposes.  See, https://archive.org/legal/affidavit.php.  Now that the issue has arisen, Plaintiffs are in the process of obtaining the authenticating declaration from archive.org with regard to the screen shots attached to Sinnreich's Report and Declaration, and will be filing same with the Court upon its receipt.

There is certainly, however, no basis for an order prematurely excluding these items *prior to trial* based on a "motion in limine."  Motions in limine are for matters that are improper, prejudicial, irrelevant and the like. The crux of Defendants' Motion as to this issue, however, is merely a reminder to the Court that a proper basis for admissibility <u>at trial</u> under Rule 901 must be present.  Such a reminder is hardly necessary, and no basis for pre-trial exclusion.

As noted in *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.***,** No. 02-3293, 2004 WL 2367740 at *1, *6 (N.D. Ill. Oct. 15, 2004) addressing a similar challenge to the "authenticity" of such screen shots:

> A Motion *in Limine* should be granted only if the evidence clearly is not admissible for any purpose. Generally, motions *in limine* are disfavored.

> Instead of barring evidence before trial, the preferred practice is to resolve questions of admissibility as they arise. By deferring evidentiary rulings until trial, courts can properly resolve questions of foundation, relevancy, and prejudice.
>
> \*\*\*
>
> **Federal Rule of Evidence 901 'requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence.'** Admittedly, the Internet Archive does not fit neatly into any of the non-exhaustive examples listed in Rule 901; the Internet Archive is a relatively new source for archiving websites. Nevertheless, Plaintiff has presented no evidence that the Internet Archive is unreliable or biased. And Plaintiff has neither denied that the exhibit represents the contents of its website on the dates in question, nor come forward with its own evidence challenging the veracity of the exhibit. **Under these circumstances, the Court is of the opinion that [the affidavit from the representative of the Internet Archive Company] is sufficient to satisfy Rule 901's threshold requirement for admissibility**.
>
> Finally, Plaintiff asserts that [the employee of the Internet Archive] is an undisclosed expert witness and that her affidavit authenticating the exhibits should be barred. The Court rejects Plaintiff's assertion that [the employee of the Internet Archive] is offering an opinion, expert or otherwise, and rejects Plaintiff's argument.

(emphasis added, citations omitted).

Defendants are certainly free at trial to present any evidence they have that supports Odenat's testimony that worldstarhiphop.com "looked like every other mixtape site" vis-à-vis G-Unit Radio mixtapes, but certainly, there is no basis to exclude Sinnreich's opinion or supporting exhibits in this regard.

    f.    **Domain Names Hosted On Worldstar's URL**

Sinnreich next opined that two of the domain names hosted on worldstarhiphop.com's server contain words related to Plaintiffs' brands and trademarks "to ultimately cause the WSHH website to appear more prominently as part of the search results at Google, Bing or another search engine when someone searches for either G-

Unit or thisis50." Again, although Defendants chose not to depose Sinnreich, they nevertheless complain that this opinion lacks a proper foundation and is based on facts materially different from the actual facts of this case.

With regard to a "proper foundation," Sinnreich details in his initial report dated May 26, 2011, in his supplemental report dated August 25, 2011 and further in his Affidavit in Support of Plaintiffs' Motion for Summary Judgment (DE 125) dated January 18, 2013, what evidence was gathered and how it was gathered. Apparently, Defendants' idea of foundational evidence is evidence that agrees with Defendants' version of facts.

With regard to Defendants' complaint that Sinnreich's opinion is based on facts materially different from the actual facts of this case, Defendants have put forth absolutely no record evidence to support this argument. Indeed, defense counsel's assertions that Sinnreich's report does not contain the correct IP address for worldstarshiphop.com and that worldstarhiphop.com does not "host" the two domain names which contain Plaintiffs' tradenames and trademarks, is the first refutation of this opinion at all. Significantly, Defendants put forth no such evidence in connection with the parties' motions for summary judgment.

Moreover, and quite obviously, Plaintiffs are entitled to put forth evidence that may conflict with Defendants' version of facts. The facts are not at all "indisputably false" and defense counsel's attempt to argue as much shows a complete lack of understanding of Sinnreich's opinion. Defendants argue:

> The domain name www.thisis50.com is in fact Plaintiffs' website and the domain name www.g-unit.com is owned by Plaintiffs and upon entering it into a web browser, links to Plaintiffs' website www.thisis50.com. Plaintiffs, not Defendants, therefore host these domain names.

This argument misstates Sinnreich's opinion and misses the point entirely. Sinnreich has stated that the domains hosted on Defendants' website are www.**thisis50.**c0mwww.worldstarhiphip.com and ww**g-unit**w.worldstarhiphop.com -- not simply www.thisis50.com and www.g-unit.com as Defendants' argument states. Defendants site contains bastardized versions of the actual names with Defendants' website name engrafted onto them. Sinnreich further opines that by hosting domains which include <u>both</u> Plaintiffs' trademarks and Defendants' website and based on how the internet works, the effect of hosting these domain names on Defendants' servers is to direct traffic to Defendants' website when people are actually searching for Plaintiff, Plaintiff's website or Plaintiff's musical group and trademark. The purposeful association of Defendant's website with Plaintiff and his trade names and marks is further proof of Defendants' intent which is very much at issue in this case.[7]

WHEREFORE, Plaintiffs request the Court to enter an Order denying Defendants' Motion in Limine.

                                                        Respectfully submitted,

                                                        GrayRobinson, P.A.
                                                        *Attorneys for Plaintiffs*
                                                        1221 Brickell Avenue
                                                        Suite 1600
                                                        Miami, FL 33131
                                                        Telephone: (305) 416-6880
                                                        Facsimile: (305) 416-6887

                                                        By: <u>/s/Karen L. Stetson</u>
                                                        Karen L. Stetson

---

[7] Defendant also contends that it has not been shown that experts in the field reasonably rely on www.yougetsignal.com. See the Declaration of Aram Sinnreich attached hereto, at ¶ 4, setting forth that the site is well recognized and widely used.

Florida Bar No. 742937
Jonathan L. Gaines
Florida Bar No. 330361

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished U.S. Mail and e-mail to: Scott Zarin, Zarin & Associates, P.C., Zarin & Associates P.C., One Penn Plaza, Suite 4615, New York, NY 10119 and to John P. Fazzio, Esq., Fazzio Law Offices, 26 Broadway, 21st Floor, New York, NY 10004 this 19th day of September, 2014.

By:   s/Karen L. Stetson